## CITY OF CLEVELAND v. WALSH CONSTRUCTION CO. et al.

(Circuit Court of Appeals, Sixth Circuit. February 7, 1922.)

### No. 3571.

1. **Appeal and error ⊙⟹849(2)—Full review after trial to court possible only upon written waiver of jury.**

   In an action at law the full review authorized by Rev. St. § 700 (Comp. St. § 1668), is permissible only when it affirmatively appears by the record that the waiver of the right to jury trial under section 649 (section 1587) was in writing, though it is immaterial, as far as the trial below is concerned, whether the waiver was oral or written.

2. **Appeal and error ⊙⟹849(2)—Trial before judge on written waiver of jury permits review of all trial rulings.**

   Where there was a written waiver of right to jury trial and the cause was tried entirely before the judge, a review may be had, not only of all questions in the primary record, but also of all rulings on the trial brought into the record by bill of exceptions; but, if the waiver was not written, the review is limited to the primary record.

3. **Appeal and error ⊙⟹265(1)—Special findings by judge trying issues are part of record.**

   Special findings by the judge who tries an action at law after waiver of right to jury either oral or written are part of the primary record, and whether they support the judgment can be considered by the reviewing court even without exceptions taken.

4. **Courts ⊙⟹352—Reference may be under common law, state practice, or stipulation.**

   Where a jury is waived in an action at law, the case may be tried before a referee either under the common-law practice, or the state practice adopted expressly or tacitly by the trial court, or under such practice as is stipulated by the parties.

5. **Appeal and error ⊙⟹849(2)—Written stipulation for reference is written waiver of jury.**

   A written stipulation by the parties for trial before a referee meets the requirement of Rev. St. § 649 (Comp. St. § 1587), for a waiver of right to jury trial, and is a waiver in writing which permits review under section 700 (section 1668).

6. **Appeal and error ⊙⟹849(2)—Referee's findings after written waiver cannot be directly reviewed.**

   Where the right to jury trial was waived in writing and the case submitted to a referee, the rulings or legal conclusions of the referee cannot be directly reviewed on writ of error to the judgment; but if the trial

⊙⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

judge proceeds under an applicable state, or stipulated practice, his rulings reviewing those of the referee become subject to review under Rev. St. § 700 (Comp. St. § 1668).

**7. Appeal and error ⚖️266(1)—Exceptions are necessary to review of trial court's rulings on exceptions to referee's report.**

Exceptions to the rulings by the trial judge on exceptions to the report of the referee are essential to review of such rulings, the exceptions to the referee's rulings being insufficient.

**8. Appeal and error ⚖️849(2)—Final findings of referee or of court adopting findings are part of record.**

Where the referee's findings are final, as under the common-law practice, or if the judge by adoption or otherwise makes his own findings, in cases where right to jury is waived in writing the findings are part of the primary record opening for review the question whether they support the judgment.

**9. Appeal and error ⚖️849(2)—Findings of referee after oral waiver of jury has same character as after written.**

Where the waiver of a jury trial is not in writing, cases tried before referee cannot be reviewed under Rev. St. § 700 (Comp. St. § 1668), and bill of exceptions and recitals of evidence are ineffective; but the findings of the referee or judge have the same character and effect as in the case of written waiver.

**10. Appeal and error ⚖️849(2)—Findings held reviewable to determine whether they support judgment.**

Where an action at law was tried before a referee under a written stipulation which might be construed as providing for complete arbitration before the referee, the referee's findings, whether construed as final or not, after their confirmation by the court, can be reviewed to the extent of determining whether they support the judgment.

**11. Municipal corporations ⚖️288(3)—Certificate that the estimated amount to satisfy improvement contract on unit basis was on hand held sufficient.**

Under a city charter requiring a certificate that the funds necessary to perform a contract are on hand before the contract shall be valid, a certificate that the amount necessary to discharge a contract on the unit basis, if the estimated quantity of materials stated in the specifications was correct, is sufficient to sustain the contract, not only to the extent of estimate, but to the extent of any excess under the contract itself, or by reason of extras required in accordance with the terms of the contract.

**12. Municipal corporations ⚖️339(1)—Voluntary practice of city in giving supplemental contract and certificates cannot affect original contract.**

The practice adopted voluntarily by a city of giving supplemental contracts and certificates to cover the excess of payments due under contracts on the unit basis over the estimates cannot affect the validity of such contracts when made so as to deprive a contractor of the right to excess where the supplementary certificates were not issued.

**13. Estoppel ⚖️62(6)—City held estopped to deny sufficiency of certificate for unit basis contract.**

Where a city advertised for bids for a contract on the unit basis and issued such a contract, supported by a certificate that the amount necessary to discharge the contract, figured on the estimated quantity of work was on hand, and permitted the contractor, in reliance on that certificate, to complete his contract, it is estopped to deny that the certificate was sufficient to cover either the contract or the additional work the contractor was required to do under its terms.

**14. Courts ⚖️365—State decision that certificate exhausting funds did not sustain excess of contract does not control where fund was not exhausted.**

A decision by the state court that a certificate of funds on hand, which the contractor knew would exhaust the fund, was insufficient to support recovery by the contractor for a large excess over the amount of the certificate, is not controlling in a case in the United States court where

⚖️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

there was no showing that the certificate exhausted the fund, and especially where in the latter case the excess was relatively small.

**15. Municipal corporations ⊜288(3)—Provision invalidating contract without certificate does not affect determination whether certificate was sufficient.**

The provision of a city charter that no contract should be valid unless the certificate of sufficiency of funds required by another section was given before the contract was executed does not affect the construction of the provision specifying the requirement of the certificate.

**16. Municipal corporations ⊜374(6)—Findings held to show refusal of acceptance of work was unreasonable.**

Findings by the referee, approved by the trial court, that no fault was found with the contractor's work, excepting as to some claims for extras, and that the work was ultimately rejected, not because of the defects, but because the contract plans and specifications were unsatisfactory support the general finding by the commissioner that the refusal of the Director of Public Utilities to accept the work on behalf of the city was arbitrary and unreasonable.

**17. Municipal corporations ⊜374(6)—Findings held to warrant assumption extra work was properly ordered.**

Where a city contract provided for its modification by subsequent written agreement and, in another paragraph, provided that no claim for additional work should be allowed unless it was furnished under written order from the Director of Public Utilities, the court cannot assumé, in the absence of an express finding by the referee, that the extra work for which the contractor was allowed payment was not within the latter provision.

**18. Municipal corporations ⊜363—Measure of recovery for defective work stated.**

Where the contractor has substantially performed his contract, but defective materials or faulty workmanship have entered into the work, the contractor is entitled to recover the contract price diminished either by the difference between the value of the building to the owner in its defective condition, and its value if perfectly constructed, if it is not reasonably practicable to remedy the defects, or by the reasonable cost of remedying the defects where that is practicable.

**19. Municipal corporations ⊜363—Cost of repairing defective work held not measure of damages where structure was worthless.**

Where a contractor for the construction of a city reservoir substantially performed his work with slight defects of workmanship therein, but, because of the defective plans prepared by the city, the reservoir, if completed in accordance with the plans or if the defective work had been repaired, would have been worthless, so that the city elected to rebuild on a different plan, the city cannot recover from the contractor the amount it would have cost to repair the defective work.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Action by the Walsh Construction Company against the City of Cleveland, in which the defendant City, as cross-plaintiff, had the National Surety Company made a party defendant. Judgment for the plaintiff (271 Fed. 701), and defendant brings error. Affirmed.

See also (D. C.) 250 Fed. 137.

Wm. B. Woods, Director of Law, and Alfred Clum, Asst. Director of Law, both of Cleveland, Ohio, for plaintiff in error.

Geo. B. Harris and Thos. S. Dunlap, both of Cleveland, Ohio (Klein & Harris, of Cleveland, Ohio, on the brief), for defendants in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. The city of Cleveland asks the reversal of a judgment rendered against it in the court below for about $22,000, as the net balance of the counterclaims of the parties.

At the outset, we must observe the subject of our power to review. The Walsh Company (which we shall call plaintiff) sued to recover from the city what was said to be the unpaid balance owing under a contract for the construction of part of a water filtration plant; the city, by counterclaim, asked damages against the Walsh Company and its surety for nonperformance of the contract; the parties stipulated in writing that a jury be waived and that the issues be referred to a commissioner. The commissioner made a report, containing elaborate findings of fact and of law. Exceptions were taken by each party to the findings of law, as if to a master's report in equity, and the trial court disposed of these exceptions and entered judgment according to the practice pursued in such cases in equity, and, we assume, in accordance with the state practice.

Under the practice as it existed before 1865, when there was a trial before the court without a jury, the judge was practically an arbitrator, and ordinarily there could be no effective review; but an agreed statement of facts, signed by counsel and filed in the case, early came to be thought a part of the technical or primary record, equivalent to the special verdict of a jury; and the question whether the judgment lawfully followed on such agreed facts could be raised on error. If the judge made special findings of fact, they were extrajudicial, and not recognized by the appellate court.[1] Section 4 of the Act of March 3, 1865, was intended to provide a fuller review, and the application of that section in its later form (sections 649 and 700, R. S.; sections 1587 and 1668, U. S. Comp. St. 1916) has caused much difficulty. This court has undertaken to apply it in many cases, of which Shipman v. Ohio Coal Exchange, 70 Fed. 652, 17 C. C. A. 313, is an early example, and Philadelphia v. Fechheimer, 220 Fed. 401, 136 C. C. A. 25, Ann. Cas. 1917D, 64, Edwards v. La Dow, 230 Fed. 378, 144 C. C. A. 520, and Lillie v. Dennert, 232 Fed. 104, 146 C. C. A. 296, are later ones. Analogous questions constantly arise, as in this case and in other cases pending decision at this time. The subject involves, not only some confusion and uncertainty among both trial and appellate courts, but much and frequent misapprehension by counsel. It ought to be clarified. After as careful a review as we can give to the very numerous decisions and to the principles upon which they must rest, it seems advisable to state our complete conclusions, which may be taken as a formulation of what we consider the appropriate and settled practice in this circuit.

[1] A waiver of jury trial may be by express stipulation in writing. meeting the letter of section 649, or it may be oral, either express or

[1] Campbell v. Boyreau, 21 How. (62 U. S.) 223, 226, 16 L. Ed. 96; Flanders v. Tweed, 9 Wall. (76 U. S.) 425, 429, 19 L. Ed. 678; Wayne v. Kennicott, 103 U. S. 554, 556, 26 L. Ed. 486; Bond v Dustin, 112 U. S. 604, 607, 5 Sup. Ct. 296, 28 L. Ed. 835; Kentucky Co. v. Hamilton (C. C. A. 6), 63 Fed. 93, 97, 11 C. C. A. 42.

to be implied from acquiescence in nonjury proceedings. We have therefore the two classes of nonjury trials: those by written waiver, and those by oral waiver. They also may be subdivided into those where the proceedings are wholly before the district judge and those which are disposed of in part before a referee—by whatever name called. As affecting the action of the trial court only, it is immaterial whether the waiver be written or oral, and whether it be express or implied;[2] but only when it affirmatively appears by the record that the waiver was written can there be the full review which is contemplated by section 700, and which is analogous to that following upon a jury trial.[3]

[2, 3] Taking up first the cases where the trial is entirely before the judge: If there was a written waiver a review may be had not only of all questions inherent in the primary record, but also of all the rulings on the trial which were imported into that record by the bill of exceptions, and which were properly challenged; but if the waiver is not written the review brings up only the primary record.[4] In the latter class, as in the former, special findings of fact by the judge became a part of that record; and whether the findings support the judgment will be considered by the reviewing court, even without exception taken.[5] Whether there was error as to admitting evidence, or

[2] Kearney v. Case, 12 Wall. (79 U. S.) 275, 20 L. Ed. 395; Gilman v. Illinois, 91 U. S. 603, 614, 23 L. Ed. 405; Dundee Co. v. Hughes, 124 U. S. 157, 160, 8 Sup. Ct. 377, 31 L. Ed. 357; Perego v. Dodge, 163 U. S. 160, 166, 16 Sup. Ct. 971, 41 L. Ed. 113.

[3] Flanders v. Tweed, 9 Wall. (76 U. S.) 425, 428, 19 L. Ed. 678; Kearney v. Case, 12 Wall. (79 U. S.) 275, 283, 20 L. Ed. 395; Boogher v. Ins. Co., 103 U. S. 90, 95, 26 L. Ed. 310; Hodges v. Easton, 106 U. S. 408, 412, 1 Sup. Ct. 307, 27 L. Ed. 169; Madison County v. Warren, 106 U. S. 622, 2 Sup. Ct. 86, 27 L. Ed. 311; Bond v. Dustin, 112 U. S. 604, 607, 5 Sup. Ct. 296, 28 L. Ed. 835; Dundee Co. v. Hughes, 124 U. S. 157, 159, 8 Sup. Ct. 377, 31 L. Ed. 357; Andes v. Slauson, 130 U. S. 435, 438, 9 Sup. Ct. 573, 32 L. Ed. 989; Spalding v. Manasse, 131 U. S. 65, 66, 9 Sup. Ct. 649, 33 L. Ed. 86. The Kearney Case specifies the different ways in which the record may show the existence of the written stipulation. In the Boogher Case certain facts outside the record were thought sufficient to raise an inference of such existence; but in the Dundee Case the same facts were thought insufficient for the same purpose; and though the Boogher Case has been very often cited, we find no case in which it has been followed on this point. As to what is a sufficient record, see Cudahy Co. v. Sioux Nat. Bank (C. C. A. 8) 69 Fed. 782, 16 C. C. A. 409.

[4] See note 3.

[5] To extend this challenge of the special findings to a case of nonwritten waiver is seemingly inconsistent with the doctrine of Campbell v. Boyreau, 21 How. (62 U. S.) 223, 16 L. Ed. 96, and Rogers v. United States, 141 U. S. 548, 12 Sup. Ct. 91, 35 L. Ed. 853, that findings of fact in the old District Court were unauthorized—a doctrine affirmed as late as Campbell v. United States, 224 U. S. 99, 105, 32 Sup. Ct. 398, 56 L. Ed. 684—when supplemented by the common holdings that as to the Circuit Courts, section 700, which recognizes findings of fact and enlarges the power of review, does not become effective unless the waiver is in writing. However, we think there is a substantial distinction. In the old District Court, findings of fact could not become a part of the record because they were wholly unknown to the practice; but in the Circuit Courts, since 1865, they might have been an authorized incident in every nonjury trial. The lack of a written stipulation pertains only to the matter of regularity, and when they are once made and filed, with the

as to the burden, or whether there was no evidence to support a particular finding, or was no justification for refusing it, or any evidence to support the judgment—all should be deemed rulings on the trial, and if properly challenged can be reviewed, but only if section 700 has become applicable by a written stipulation.[6]

[4-7] Coming to the other class of cases, where there has been a reference, and the trial proceeds before the referee as preliminary to its conclusion before the judge: The reference may be under the common-law practice, or the trial judge may adopt and follow the state practice, indicating such adoption either by express order or by tacitly following such practice after the referee's report, or the parties may, with the judge's approval, stipulate to extend or narrow the referee's functions.[7] A written stipulation for, or recognizing, the reference, meets the requirements of section 649, and is a waiver in writing and permits review under section 700.[8] In such case review thereunder will not directly reach the rulings or legal conclusions of the referee; but if the trial judge thereafter proceeds under the applicable state

acquiescence of the parties in that practice, they may well be thought a valid part of the record—as much as is the judgment which is rendered without a jury and without written consent—and thus equivalent to a special verdict.

In Shipman v. Straitsville, 158 U. S. 356, 361, 15 Sup. Ct. 886, 39 L. Ed. 1015, there had been no written stipulation, but a referee's findings were thought to have become those of the judge, and for that reason it was concluded that the question was open whether they supported the judgment. This case clearly modifies the broad language of Bond v. Dustin, but, unless the court inadvertently gave a wrong reason, its effect cannot be confined to situations where there was a referee, as was done by Judge Thayer (Cudahy Co. v. Sioux Nat. Bank [C. C. A. 8] 75 Fed. 473, 474, 21 C. C. A. 428). The reason why no exception is necessary as a basis for review of the sufficiency of special findings is that they become a part of the record, instead of being proceedings on the trial to be brought in by bill of exceptions (Webb v. National Bank [C. C. A. 8] 146 Fed. 717, 719, 77 C. C. A. 143; Chicago, R. I. & P. Ry. Co. v. Barrett [C. C. A. 6] 190 Fed. 118, 123, 111 C. C. A. 158), and, for the same reason, once concede that special findings in a nonwritten waiver case become a part of the record, no resort to section 700 is necessary to give the right to review; the analogy to an agreed statement or a special verdict becomes perfect. This court has adopted and repeated the broad rule of Bond v. Dustin (City of Defiance v. Schmidt, 123 Fed. 1, 3, 59 C. C. A. 159), but neither in that case, nor in any other here authoritative, were there special findings and an effort to get this review. Our conclusion in the text is supported by inference from Paine v. Central Vermont R. Co., 118 U. S. 152, 158, 6 Sup. Ct. 1019, 30 L. Ed. 193, where findings were deemed part of the record, though not pursuant to section 700. It is opposed by Merrill v. Floyd (C. C. A. 1) 53 Fed. 172, 3 C. C. A. 494; Branch v. Texas Co. (C. C. A. 5) 53 Fed. 849, 4 C. C. A. 52; Rush v. Newman (C. C. A. 8) 58 Fed. 158, 7 C. C. A. 136.

[6] Humphreys v. Third Nat. Bank (C. C. A. 6) 75 Fed. 852, 853, 21 C. C. A. 538; Wright v. Bragg (C. C. A. 7) 96 Fed. 729, 732, 37 C. C. A. 574; Philadelphia Co. v. Fechheimer (C. C. A. 6) 220 Fed. 401, 407, 136 C. C. A. 25, Ann. Cas. 1917D, 64. Dickinson v. Bank, 16 Wall. (83 U. S.) 250, 258, 21 L. Ed. 278, is not inconsistent with the existence of cases where the duty to make or refuse a particular finding of fact depends upon a question of law. In St. Louis v. Rutz, 138 U. S. 226, 241, 11 Sup. Ct. 337, 34 L. Ed. 941, the requested findings of fact may have involved conflicting evidence.

[7] Dundee Co. v. Hughes, 124 U. S. 157, 160, 8 Sup. Ct. 377, 31 L. Ed. 357; Hecker v. Fowler, 2 Wall. (69 U. S.) 123, 131, 17 L. Ed. 759; Tiernan v. Chicago Co. (C. C. A. 8) 214 Fed. 238, 242, 131 C. C. A. 284.

[8] Boogher v. Ins. Co., 103 U. S. 90, 26 L. Ed. 310.

or a stipulated practice, his rulings reviewing those of the referee will thus become subject to review under section 700. Of course, there must be exceptions to the judge's rulings; exceptions to those of the referee will not suffice.[9]

[8, 9] Still with reference to cases of written stipulation: If the reference is at common law, and the findings of the referee are therefore final, or if, under other practice, after review they stand as his findings, intact or modified, or if the judge by adoption or otherwise makes his own findings, in either case the fact findings must be deemed a part of the primary record, opening for review the question whether they support the judgment. Cases of reference, where the jury waiver is not in writing, cannot be reviewed under section 700, and bills of exceptions and recitals of evidence are ineffective; nevertheless, the findings in any of the forms just recited have the same character and effect as in the case of written waiver.[10]

[10] In the present case the written stipulation of the parties lends itself to the construction that it provides for a complete arbitration before the referee; but it is not clear to this effect, and both parties and the court below have interpreted it otherwise. Under the circumstances of this case, some of which have not been stated, the referee's findings of fact might be thought to amount to an agreed statement of facts: but whether they be so considered or merely as referee's findings which have been confirmed by the court, we have jurisdiction to inquire whether they support the judgment; and that is sufficient to reach all the important questions presented.

The waterworks system in Cleveland, of which this new structure was to be a part, was maintained by fees charged to the users, and the funds to pay for this improvement were to be obtained from bonds sold or to be sold, and to the payment of which the revenues of the water department were to be devoted. The sections of the city charter claimed to be controlling are quoted in the margin.[11]

---

[9] Boogher v. Ins. Co., 103 U. S. 90, 98, 26 L. Ed. 310; Lupton v. Auto Club, 225 U. S. 489, 494, 495, 32 Sup Ct. 711, 56 L. Ed. 1177, Ann. Cas. 1914A, 699; Philadelphia Co. v. Fechheimer (C. C. A. 6) 220 Fed. 401, 136 C. C. A. 25, Ann. Cas. 1917D, 64.

[10] We find no express holding that where the findings of fact are those of a referee as such, there can be review of their sufficiency; the effort often has been to find them transformed into the judge's findings; but we see no way to give them less standing than those of a judge in oral waiver cases; indeed, they are of higher standing, because they have always become part of the record. See note 5 and Paine v. Central Co., 118 U. S. 152, 158, 6 Sup. Ct. 1019, 30 L. Ed. 193 (which held the trial not to be under sections 649 and 700); Roberts v. Benjamin, 124 U. S. 64, 71, 8 Sup. Ct. 393, 31 L. Ed. 334; Shipman v. Straitsville Co., 158 U. S. 356, 15 Sup. Ct. 886, 39 L. Ed. 1015; Chicago, etc., Co. v. Clark, 178 U. S. 353, 364, 20 Sup. Ct. 924, 44 L. Ed. 1099; Steel v. Lord (C. C. A. 2) 93 Fed. 728, 35 C. C. A. 555; Shipman v. Ohio Coal Exchange (C. C. A. 6) 70 Fed. 652, 17 C. C. A. 313; Steger v. Orth (C. C. A. 2), 258 Fed. 619, 620, 170 C. C. A. 73; Demotte v. Whybrow (C. C. A. 2) 263 Fed. 366.

[11] "Sec. 122. No contract, agreement or other obligation, involving the expenditure of money shall be entered into, nor shall any ordinance, resolution, or order for the expenditure of money be passed by the council or be authorized by any officer of the city, unless the director of finance first certify to the council or to the proper officer, as the case may be, that the money re-

Assuming, for the present, the applicability of these sections, we find that the contract called for a structure of concrete fully described in terms of its ultimate form and size, but provided for payment on the "unit plan," whereby the price was so much per cubic yard of excavation, so much per cubic yard of concrete laid, etc. The contract was pursuant to an acceptance of plaintiff's bid, and plaintiff's bid or proposition had been pursuant to specifications advertised by the city as a basis for competitive bidding. Accompanying these specifications was an estimate prepared by the city and given out as the basis that it would use in comparing bids, since the bids themselves were necessarily to be of prices per unit and not of an entire price. The prices which the plaintiff bid and which were decided to entitle it to the position of the lowest bidder, when computed according to the estimate of the units to be done, made a total of about $272,000. When the work was finished according to specifications, it developed that the true computation was about $300,000, in addition to about $9,000 for extras which had been furnished by the contractor in full compliance with the conditions of the contract upon that subject. At the time of making the contract, the Director of Finance certified that there was the sum of $272,000 in the city treasury to the credit of the fund and not appropriated for any other purpose and from which payment to the contractor was to be made. The amount so certified has been nearly all paid to the plaintiff, and the claim in suit is substantially for the excess.

The court below assumed that if the proceedings had been under the general municipal code of Ohio instead of under the Cleveland charter, and in a case where the certificate was necessary, the contract, as to the excess over $272,000 would be void for lack of the essential

quired for such contract, agreement, obligation, or expenditure is in the treasury, to the credit of the fund from which it is to be drawn, and not appropriated for any other purpose, which certificate shall be filed and immediately recorded. The sum so certified shall not thereafter be considered unappropriated until the city is discharged from the contract, agreement or obligation.

"Sec. 123. All moneys actually in the treasury to the credit of the fund from which they are to be drawn, and all moneys applicable to the payment of the obligation or appropriation, involved, that are anticipated to come into the treasury before the maturity of such contract, agreement or obligation, from taxes or assessments, or from sales of services, products or by-products or from any city undertakings, fees, charges, accounts and bills receivable or other credits in process of collection; and all moneys applicable to the payment of such obligation or appropriation, which are to be paid into the treasury prior to the maturity thereof, arising from the sale or lease of lands or other property, and moneys to be derived from lawfully authorized bonds sold and a process of delivery shall, for the purposes of such certificate, be deemed in the treasury to the credit of the appropriate fund and subject to such certification."

"Sec. 125. All contracts, agreements or other obligations entered into and all ordinances passed, resolutions and orders adopted, contrary to the provision of the preceding sections, shall be void, and no person whatever shall have any claim or demand against the city thereunder, nor shall the council, or any officer of the city, waive or qualify the limits fixed by any ordinance, resolution or order, as provided in section 122, or fasten upon the city any liability whatever, in excess of such limits, or release any party from an exact compliance with his contract under such ordinance, resolution or order."

certificate, under the rule of Carthage v. Diekmeier, 79 Ohio St. 323, 87 N. E. 178. What was formerly section 2702 of the Revised Statutes, and has later been section 3806 of the General Code, is in the same form as section 122 of the charter, and section 3807 of the General Code is the same as section 125 of the charter. The court also thought that section 123 of the charter found its complete equivalent in sections 3810 and 3797 of the General Code, and concluded, also, that in view of this complete equivalency, it ought to follow the line of Ohio decisions,[12] holding that no certificate was necessary in the class of contracts to which the present one was thought to belong. Upon review of these sections of the General Code and these decisions we are not satisfied that section 3797 serves to complete the equivalency between section 3810 of the Code and section 123 of the charter, nor that the decisions necessarily would cover such a contract as this so as to work its exemption from section 3807; but it is not necessary to determine either of these questions. For the purposes of this opinion we assume that the city is right and that it was necessary for the contract to have the certificate contemplated by section 122 in order to be valid under section 125; and we must therefore look further to determine whether the certificate that was here furnished made this contract valid, above the $272,000 limit.

[11] This contract was made upon the unit basis already stated, and also provided that additional work not covered by plans and specifications, but of the same character, must be done if the engineer in charge so ordered. It was assumed on the argument, and is matter of general knowledge, that construction contracts upon the unit basis and providing for extras are and have been in common use by municipalities generally; indeed, it is difficult to see how some kinds of building and construction contracts could be made unless they were thus characterized. It is not suggested that such contracts are against any sound rule of public policy. It is clear enough that the customary construction contract, having these elements, is either all valid or all invalid. It requires that the ultimate result, shown by plans and specifications, shall be fully accomplished regardless of the quantities that turn out to be necessary. Cities would not enter into such contracts, unless they could require the necessary extras or unless they could have the contractor's agreement, and usually bond, to complete the improvement within a fixed time. Contractors would not agree to finish the work within the stated time, or, indeed, to do any of it, unless they were to be paid for all which they were to be required to do. Save as the amount of the contract may be computed by the advance estimates of the work to be done, there is no possibility of making the certificate in question. It follows that unless such a certificate as is here given is sufficient to satisfy section 122, the city of Cleveland can make no valid contract for work upon the unit basis nor giving it the right to demand and receive any extras whatever. It is not reasonable to think

---

[12] Kerr v. Bellefontaine, 59 Ohio St. 446, 52 N. E. 1024; Comstock v. Nelsonville, 61 Ohio St. 288, 56 N. E. 15; Emmert v. Elyria, 74 Ohio St. 185, 78 N. E. 269; Akron v. Dobson, 81 Ohio St. 66, 90 N. E. 123; Frisbie Co. v. East Cleveland, 98 Ohio St. 266, 120 N. E. 309.

that this was the intent of the chartermakers; nor can that conclusion be accepted unless it is inevitable.

[12] The Carthage Case, supra, does not decide that the contract is valid up to the extent of the certificate; no question was involved or decided save its validity as to the excess. The stated practice of the city to give supplementary contracts and certificates to cover excess developing on unit basis contracts is wholly voluntary; it cannot affect the validity of the original contract.

[13] We are not dealing with a case where there is any suspicion of bad faith or overreaching, nor even where the excess developed above the amount of the certificate is so great as to dominate the original sum. The excess, both as to extras and as to units above the estimate, is relatively small, and is of the character normally incidental to every such contract. With that background, we find that the city made the estimate of quantities and submitted this estimate to the proposed bidders as the one which would be used to canvass their bids, and submitted, also, the proposed contract and specifications which showed the conditions under which extras might be required and would be paid for. Upon the faith of these representations, every contractor made his bid. Relying upon the total contract amount resulting from plans, specifications and bids the city furnished the certificate in question, and relying upon the sufficiency of this certificate as a compliance with the city charter, the contractor signed the contract and did the work. To deny, now, the liability of the city because the certificate which it furnished was not the right one seems to us to be unfair to the contractor, and, lacking any Ohio decision to the contrary, we should not hesitate to hold the city estopped to take any such position. True, the city is not estopped by accepting the work when there has been no certificate; but here, we have only the question of the regularity of the one which was given. Every one concerned in its execution and in acting upon it believed it to be the appropriate one, and it was, in truth, the most fitting one that could have been made. Even if the rule of estoppel is not applicable, we think that the statutory certificate was made, in that the form here used was a substantial compliance with section 122.

[14] The Carthage Case, supra, is not inconsistent with this conclusion. Under the rule in Ohio, the law of the case is found only in the syllabus; but the general language of a syllabus does not necessarily go beyond the facts of the case. The conclusion in the Carthage Case that the contract was not valid beyond the sum named in the certificate, as stated in the second paragraph of the syllabus, refers back to the circumstances of the case recited in the first paragraph, and from these, as further stated in the opinion, it appears there was a fund of $40,000, raised by bond issue for street improvement purposes; that several contracts, including the one in suit, were let by the same bidding, at the same time, and with plaintiff's knowledge, in amounts which, computed by estimates employed and added together, exhausted the whole fund; that, on plaintiff's contract, the total amount proved to be more than 200 per cent. of the amount estimated, while the total excess on the group of contracts was more than 50 per cent. above the

total fund available. Plaintiff therefore knew, when he accepted his contract, that the amount of his estimate would exhaust the whole fund which could be applied to his contract, and there was no room to apply the doctrine of estoppel in his favor; on the contrary, he might well be thought estopped to make a claim against a surplus when he knew there was none. Here, there is no finding that the treasury fund would have been exhausted at the date of the contract by the certificate given —the natural inference seems to be that there was then a surplus sufficient to cover incidental excess. The case is thus so fully distinguishable that we would not be departing from it by holding the city of Cleveland herein estopped—even if it were necessary to follow Ohio decisions upon the point whether given facts made out an estoppel of this character—nor, wholly aside from the rule of estoppel, would the conclusion that such a certificate was not good, under the facts of the Carthage Case, necessarily determine that it was not good under the facts of this case. Further, the fact that in the Carthage Case, the contractor knew there was no surplus in the treasury which could be used to pay him more than the estimated amount, furnishes the most substantial distinction we can find between that case, where the certificate was held necessary, and the Elyria Case, where it was held unnecessary. This indicates that the insufficiency of the only fund was the dominant fact leading to the result in the Carthage Case, and hence that the decision should not reach a case where that dominant fact is not present. We conclude that the $272,000 certificate made the contract valid as to all the work done.

[15] Nor do the provisions of section 125 prevent this conclusion. It provides, in effect, that any contract, without the required certificate, shall be wholly void; but it does not play any part in defining the requirement, nor permit the city to repudiate the certificate which it has furnished and which the bidder has accepted as and for a compliance, when it is in fact the closest possible compliance, and in a case where the precise amount estimated would not exhaust the fund. The express limitations of section 125 upon the power of the council or any officer to waive or qualify fixed limits refer to the limits fixed by ordinance, resolution, or order, not to contracts.

[16] The recovery is further contested by the city because there never was any final acceptance by the Director of Public Utilities, on behalf of the city, as the contract prescribes. Counsel concede that an arbitrary and unreasonable refusal to accept would prevent the city from making this defense; and the commissioner finds, as facts, that the director could and should have given the formal acceptance required under the contract, that he should have done so at a time some months before there was any intimation that general acceptance would not be made, that, for a period of six months after the work was finished and a least partially taken possession of by the city, no fault was found, excepting as to some of the claims for extras, and that the ultimate rejection, instead of insisting upon a curing of defects, was because the city conceded that the contract plans and specifications were unfit. The district judge interpreted these findings as leading to the inference that the final general refusal was arbitrary. The city's only

criticism is that there were detailed findings by the commissioner showing that specific defects actually existed and that these other findings were inconsistent with and therefore neutralized the general finding that the refusal was unreasonable. This does not follow. The specific defects were unknown during all this period, although the city had opportunity to find them; they pertained to matters which had passed the city's current inspection with approval; they were capable of correction by the contractor and the contract contemplated such correction rather than a general refusal without opportunity given for perfecting. Whether their existence was substantially inconsistent with the commissioner's general finding depended upon a consideration of all the testimony in the case and could not be governed by a few specific findings; the commissioner did not find such inconsistency; and the city's objection is really to the effect that the testimony, considered all together, does not support the general finding. Such objection we cannot consider because, if for no other reason, the testimony is not here. This defense—for lack of final acceptance—cannot prevail.

The allowances for extra work amounted to about $7,500 for repairing an injury caused by the city, about $800 for another similar matter, and about $1,100 on account of a change made by the city in the plans and specifications.

[17] Paragraph M of the contract provides that it and the specifications may be modified or changed from time to time as may be agreed to in writing between the parties in a manner not materially affecting the substance. Paragraph N specifies that no claim for additional work or materials will be allowed to the contractor unless the same have been furnished under a written order from the Director of Public Utilities, given before the furnishing. Paragraph N plainly implies that if the written order has been given, the contractor shall receive payment therefor. How to distinguish between that additional work and materials which may thus be authorized and that modification of the contract and specification which can be effected only by subsequent written agreement signed by both parties, we do not know. There is an express finding that some of this extra work had the necessary authority in writing to satisfy paragraph N; there is no express or necessarily implied finding that any of it did not; and since it had all been accepted by the engineer and estimates given for it, we cannot, in the absence of finding, assume that any of it was unauthorized under paragraph N, or was of that character which could not be permitted without the new written contract contemplated by paragraph M. The allowance for extras must be sustained.

[18, 19] The city further assigns error because it was not allowed to recover against the contractor the amount of $56,350, which sum it was found by the commissioner would have been the cost of replacing those portions of plaintiff's work which the commissioner had found were not in accordance with the specifications. Instead of this sum, the commissioner awarded to the city, as an offset against plaintiff's claim, the amount of about $14,600, which he found was the sum total of the contract price paid by the city or awarded against it for the same items of defective work. To appreciate rightly these respective claims

requires a further statement of fact. About six months after the work was finished and before the controversy as to extras had been adjusted, one unit of concrete work—a rather trifling fraction of the whole— collapsed. Investigation indicated that the quality of the concrete at this point was defective according to the specification standard. Thereupon, a general reinvestigation of the entire work developed similar defects in isolated areas here and there throughout the work. This defect was said to be due to the use of a particular mixing machine which the city had asked the contractor to use; but that was not found to be a controlling circumstance. The total amount of the defective concrete was computed in cubic feet and the contract cost of the same was found to be this sum of $14,600; owing to the necessity of tearing down other parts in order to make these replacements, the cost of putting the whole job in the condition required by the specification would have been the other sum of $56,350. No replacement or repair was in fact made, but about this time the city abandoned the general plan contemplated by the plans and specifications and adopted another plan whereby such repairs or replacements would have been of no use to any one. The reason for this change in plan was that the city became convinced that its original plans called for a structure not. suitable to the location and the existing subsoil, and concluded that, even if there had been no defect whatever in the plaintiff's performance of its contract, the resulting structure would have been a failure. In the construction of the new structure, the old one was used only as an outer shield or backing supplementing the new one, and for this purpose the defective areas were substantially, if not quite, as good as if they had been according to contract conditions, and for this purpose they were accepted and used by the city to the same extent as all the rest of the old structure was accepted and used. As to the proper measure of damages in this situation, we approve and adopt the discussion by the District Judge, as follows:

"In some cases, where the structure is a total loss, due to the defective materials or faulty workmanship of the contractor, and the owner elects not to reconstruct according to the original plans and specifications, but in another location and upon new and different plans, the measure of damages is held to be the amount paid to the contractor for the original structure. See U. S. v. McMullen, 222 U. S. 460, 32 Sup. Ct. 128, 56 L. Ed. 269; U. S. v. U. S. Fidelity & Guaranty Co., 236 U. S. 512, 35 Sup. Ct. 298, 59 L. Ed. 696; Lincoln County v. Coast Bridge Co. (D. C.) 231 Fed. 468. Upon the facts here found, this rule obviously is not applicable, because, if the location and design of the original structure had been sufficient, the loss from faulty workmanship would have been slight and easily remedied.

"The measure of damages properly to be applied is that applicable to a contract which has been substantially performed but into the performance of which have entered defective materials or faulty workmanship, or departures from the plans and specifications. In cases of this character, two rules have been applied, depending somewhat upon the circumstances of each case. One is that the contractor is entitled to recover the contract price diminished by the difference between the value of the building to the owner in its defective condition, and its value if perfectly constructed. This rule is applied whenever the structure or building is useful to the owner in its defective condition and it is neither fair nor reasonably practicable to remedy the defects by the making of repairs. In other words, where there is a failure to complete the work, and such failure may reasonably be remedied by the expenditure of

additional labor and materials, or where the defects are of such a character that they may be fairly and reasonably remedied by the expenditure of labor and materials, the proper rule seems to be to deduct from the contract price such sums as would be reasonably necessary to complete the work according to the contract or to make such repairs. Sutherland on Damages, § 699; Stillwell Mfg. Co. v. Phelps, 130 U. S. 520, 9 Sup. Ct. 601, 32 L. Ed. 1035; Gleason v. Smith, 9 Cush. (Mass.) 484, 57 Am. Dec. 62; Pelatowski v. Black, 213 Mass. 428, 100 N. E. 831. No finding, as has been said, is made by the master as to the difference in value between the reservoir in its defective condition, and the contract price, nor how much less valuable the reservoir is to the owner by reason of faulty workmanship. No evidence seems to have been offered on this proposition. The burden of proof in that situation is apparently on the owner. Filbert v. Philadelphia, 181 Pa. 530, 547, 37 Atl. 545; District of Columbia v. Clephane, 110 U. S. 212, 3 Sup. Ct. 568, 28 L. Ed. 122. Apparently, the master's conclusion is that the reservoir, except as to the collapsed portion, was worth as much with the faulty workmanship as it would have been with perfect workmanship, and that by reason of its original defective design, it was worth practically nothing in either condition, except as it served as a basis for the new and different reconstruction work provided for in the Casey contract.

"The sum of $56,350, found by the master to be necessary to remedy the faulty workmanship, would undoubtedly be the true measure of the city's damages, if the structure had otherwise been adequate. Such expenditure would have been a reasonable and practical way of making repairs within the rules of law stated in the cases above cited. Moreover, it is the method of making repairs and the measure of damages provided in the contract for defects in material and workmanship, whether the necessity therefor arises before acceptance or afterwards and within the guaranteed period of one year from date of such acceptance. The difficulty of applying this rule is that the repairs were not made, for reasons for which the city alone was responsible. It would have been useless and unnecessary to make them in view of the method of reconstruction adopted by the city, and it is likewise true, upon the master's finding, that it would have been useless to have made them if some such plan of reconstruction had not been adopted, for a reservoir would not thereby have been produced fit for the purposes for which this one had been designed and built. The original structure, with these defects, was just as valuable under the plan of reconstruction as would the original structure have been with perfect workmanship. In view of all these circumstances, the master was right in holding that the cost of repairs which were not made, and the making of which would have served no useful purpose, is not to be taken as the true measure of the city's damage.

"In this situation and in the absence of any finding of how much less the original reservoir in the defective condition was worth to the owner than the original contract price, or if perfectly built, the city is not entitled to complain of the measure of damages actually adopted by the master. The plaintiff does not complain. This measure, as already stated, is to deduct from the contract price, all that was paid by the city to the contractor for that portion of the concrete work which was found to be defective by reason of faulty workmanship. The contractor ought not in equity to have or retain money paid to him for work done that was not good, but was faulty or defective. If the contractor is required to surrender all compensation for that part of the work which was thus found to be defective, it would seem to me that substantial justice is done."

The plaintiff has claimed that it should not have been charged with the $14,600 offset, and the city has insisted that it should recover the entire cost of its new structure, but neither claim has been saved for ruling here.

The judgment is affirmed.