GEORGE A. FULLER CO. v. B. P. YOUNG CO.

Circuit Court of Appeals, Third Circuit. December 14, 1903.)

No. 49.

1. BUILDING CONTRACTS—CONTROVERSIES—DECISION—IMPLIED PROVISIONS.

Where a building contract did not provide that the architect's decision on any disputed question should be final and conclusive, a provision to such effect could not be implied.

2. SAME—PERFORMANCE OF WORK—SATISFACTION OF DESIGNATED PERSON.

Where a sub-building contract provided that the materials should be furnished and the work performed under the direction and to the satisfaction of the architects, and, in order that their direction might be effectively exercised, declared that the subcontractor at all times must afford safe and proper facilities for inspection by the architects, the contractor, or their representatives, and that any improper material must be immediately removed, and unsatisfactory work made right, and that, if the subcontractor refused to remove or rectify, the contractor could terminate the contract and finish the same at the subcontractor's expense, it was the duty of the architects and the contractor to object to material claimed to be defective as the work went on, and order the same removed, and hence, after the work had been completed, the owner was not entitled to make a deduction from the contract price for alleged unsatisfactory material and work.

3. SAME—ARCHITECTS' CERTIFICATE.

Where a sub-building contract provided that the certificate of the contractor's superintendent or of the architects should be necessary before any installment should be paid while the work was going on, and that the final certificate should be conclusive evidence of the performance of the contract, such provisions did not make the production of a final certificate a condition precedent to the subcontractor's right to recover on completion of the contract.

4. SAME—PERFORMANCE OF CONTRACT—QUESTION FOR JURY.

Where a subcontract for the furnishing of the marble work of an office building provided that the marble should be "Blanco P. Carrara" marble, and plaintiff's witnesses testified that such marble was not pure white, but was marble of the character furnished, and that pure white marble was known as "Blanco Puro," while the architects testified that by "Blanco P. Carrara" marble they meant to specify pure white marble, whether plaintiff had substantially complied with the contract was a question for the jury.

In Error to the Circuit Court of the United States for the Western District of Pennsylvania.

J. H. Beal, for plaintiff in error.

R. B. Ivory, for defendant in error.

Before DALLAS and GRAY, Circuit Judges, and McPHERSON, District Judge.

J. B. McPHERSON, District Judge. In January, 1901, Henry C. Frick, of Pittsburg, the owner, desiring to erect a large and handsome office building, to be 19 stories high, made a contract with the George A. Fuller Company, which provided, inter alia, that the contractor should call for bids from subcontractors for the various divisions of the work, but should accept such bids only as the owner should approve. The call was duly made, and in reply thereto the

¶3. See Contracts, vol. 11, Cent. Dig. §§ 1308, 1312.

B. P. Young Company offered to furnish and set in place the marble and tile work, according to the plans and specifications of D. H. Burnham & Co., the architects in charge of the enterprise, for the sum of $325,000. The offer was accepted, and a subcontract was executed in February between the Fuller Company and the Young Company, under which the present dispute arises. The relevant provisions of the agreement are to be found in the following paragraphs:

"Art. 1. The subcontractor, under the direction and to the satisfaction of D. H. Burnham & Co., architects, shall and will provide all the materials and perform all the work mentioned in the specifications and shown on the drawings prepared by the said architects for the entire furnishing and erecting of all marble work, marble and mosaic tile floors, all encaustic tile, concreting under floors, etc., necessary to complete the nineteen stories, basement, subbasement and club story office building, situate on Grant Street, between Fifth avenue and Diamond street, in the City of Pittsburgh, Pennsylvania, for Mr. H. C. Frick, in accordance with the general conditions, drawings, specifications and details, which drawings and specifications are identified by the signatures of the parties hereto."

"Art. 4. The subcontractor shall provide sufficient, safe and proper facilities at all times for the inspection of the work by the architects, the contractor or their authorized representatives. He shall, within twenty-four hours after receiving written notice from the contractor to that effect, proceed to remove from the grounds or building all material condemned by them, whether worked or unworked, and to take down all portions of the work which the architects or contractor shall by like written notice condemn as unsound or improper, or as in any way failing to conform to the drawings and specifications."

Article 5 provides, inter alia, that if the subcontractor shall "fail in the performance of any of the agreements here contained," the contractor may terminate the subcontractor's employment, upon three days' notice, and may itself finish the work.

"Art. 10. It is hereby mutually agreed between the parties hereto, that the sum to be paid by the contractor to the subcontractor for the said work and materials shall be three hundred and twenty-five thousand ($325,000) dollars, subject to additions and deductions as hereinbefore provided, and that such sum shall be paid in current funds by the contractor to the subcontractor, in installments as the work progresses, and upon the presentation to the contractor of written certificates, approved by its superintendent or by the architects, to the effect that such payments have become due. Fifteen per cent. of the value of all work done and materials furnished shall be held back, however, and not certified until the time for final payment arrives as hereinafter stated.

"The final payment shall be made within thirty days after this contract is fulfilled.

"Art. 11. It is further mutually agreed between the parties hereto that no certificate given or payment made under this contract, except the final certificate or final payment, shall be conclusive evidence of the performance of this contract, either wholly or in part, and that no payment shall be construed to be an acceptance of defective work or improper materials."

The specifications contain the following provisions:

"All materials shall be the best of their respective kinds."

"All work shall be done in a neat and skillful manner, exactly as specified or detailed, and if not mentioned or detailed, as the architects may direct. In all cases the work shall be done to the entire satisfaction of the architects.

"All rejected or condemned materials shall be at once removed from the premises and shall not be used in this work.

"All marble shall be of the very best quality, free from cracks, stains, sandholes, or flaws of any sort, and shall be selected to run in even shades. The

foreign marble shall be of the kind specified or marked on drawings, and where not marked shall be as selected by the architects.

"All marble shall be set straight to the lines indicated, and the work executed in accordance with details and left in a perfect state, free from stain, mar or defacement of any kind.

"All marble in all corridors and throughout the building, unless otherwise specified, excepting floors and stair treads, to be the best Blanco P. Carrara marble.

"All marble except floors and panels on Grant Street entrance hall and entrance corridor from Fifth avenue to Diamond street on first floor, and grand staircase to basement, and basement entrance hall, to be the best Blanco P. Carrara marble."

As the work progressed, the architects from time to time expressed dissatisfaction verbally with the marble wainscoting and tiling. Upon one occasion they gave a written notice to the contractor, under the fourth article, that the marble floor in one of the corridors must be removed, because its color was light blue instead of white; and this notice was repeated to, and promptly obeyed by, the subcontractor. The principal source of dispute is to be found in what seems to have been the architects' misunderstanding concerning the meaning of a phrase. As appears from the foregoing quotations, the specifications call for "Blanco P. Carrara" marble for the wainscoting, and the architects supposed that they were calling for Blanco Puro, intending thereby to specify a pure white marble; but it clearly appears in the course of the trial that "Blanco P." marble is "Blanco Poissant," the latter word being the name of a firm that owns certain quarries in Italy from which marble is produced, and that "Blanco P." is understood by the importing trade generally to mean the marble from these and the neighboring quarries in a limited district. It has well-known characteristics of color and structure. It is not pure white, but of a pearly or slightly bluish color; is comparatively, although not wholly, free from veins; shows some cloudiness of background; and is of fine grain and susceptible of a high polish. The subcontractor furnished a good quality of this marble, but the architects were dissatisfied with much of it, because it did not conform to their standard of pure white, and because they regarded many of the slabs as not well matched. As already stated, however, they gave only one notice under article 4, but they refused to give the subcontractor a final certificate; and on September 30, 1902, after the building was finished, and the owner had taken possession, they certified to him as follows, inter alia:

"The amount of materials called for in the contract has been furnished and set in place, but the marble, granite, terra cotta and terrace floor are not done according to the contract. Very much of each of them was rejected when put in and has never been accepted.

"To make the interior marble what should be will cost $60,000."

Accordingly, the owner withheld this sum from the Fuller Company, which refused to make the amount good to the Young Company, and this suit is the result. The learned judge of the Circuit Court refused to instruct the jury that the verbally expressed dissatisfaction of the architects was sufficient, under the contract, to prevent recovery; holding that such dissatisfaction must be founded on cause, and must not be arbitrary or unreasonable (following City of

Elizabeth v. Fitzgerald, 114 Fed. 547, 52 C. C. A. 321), and submitting the question to the jury whether the architects' conduct in this respect was justified by the facts. He also refused to instruct the jury that the subcontractor could not recover under the contract in the absence of a final certificate from the architects, or a sufficient explanation of its absence; deciding that the contract did not make such a certificate a condition precedent to recovery, and that the architects' certificate of September 30th, given to the owner, was not binding and conclusive upon the subcontractor. He left to the jury the question whether the work undertaken by the subcontractor had been substantially performed according to the plans and specifications of the architects, and instructed them that, if the subcontractor had shown a substantial performance, he was entitled to recovery. These rulings are assigned for error, and we are therefore required to consider their correctness.

In the court below the defense rested wholly upon the testimony of the two architects, and this was contradicted by much evidence to the effect that the materials furnished were of the kind and quality called for by the specifications, and that the work was well done. Moreover, it appeared that the architects and contractor constantly supervised the erection of the building, saw the offending material being put into place, and did not require its removal, as they had ample authority to do under the subcontract. There would have been no difficulty about removing the material while the work was progressing, for the marble wainscoting and tiling were not indispensable parts of the structure, but were merely affixed to the walls and floors. What has happened, therefore, is this: The contractor, and through him the owner, have the advantage of $60,000 worth of the subcontractor's material and labor, which they profess to be unsatisfactory, adopting the architects' declaration to this effect, but nevertheless continue to use and enjoy. In other words, they diminish the contract price by $60,000, retaining that sum as a recompense for what is said to be the unsatisfactory character of the work. They do not reject the offending materials, but keep them in the building, while they insist upon paying a smaller price than was agreed upon. These materials were received and are retained under the contract, which fixes a definite sum to be paid therefor, but they are being treated by the owner and contractor as if they had been furnished for whatever price the architects should decide them to be worth. If this result is a necessary consequence of the written agreement, the subcontractor must endure it. If one of the parties to an agreement is permitted thereby to assert dissatisfaction with the other's work and materials, while he continues to enjoy them at a diminished price, to be fixed by himself without appeal, it may be conceded that the contract, although improvident, is not unlawful. But a conclusion so harsh should rest upon clear and plain language, which a positive rule of law requires to be enforced. In our opinion, no such conclusion can be properly drawn from the contract of February, 1901. Its provisions must be read together, and its true meaning can only be gathered by considering the instrument as a whole.

It will be observed that nowhere in the writing is the architects'

decision upon any disputed question made final and conclusive. Such a provision does appear in the contract between the owner and the Fuller Company, but it is not found in the agreement now being considered. We need not discuss, therefore—and we certainly do not intend to criticise in the slightest degree—the line of cases in which it has been held that by a clear and definite agreement upon this subject the parties may establish their own tribunal, and may bind themselves to accept its findings without an opportunity for appeal or revision. This particular contract contains no such provision, and, of course, none is to be implied.

Neither are we concerned with the cases that have discussed the effect to be given to an unqualified provision that certain work should be done to the satisfaction of a designated person. There is no such provision here, for, in our opinion, the clause requiring the subcontractor to satisfy the architects should be read in connection with the fourth article, and is materially modified thereby. The subcontract did not leave the owner and contractor unprotected, for it gave to both a thoroughly efficient remedy for any unsatisfactory work or materials that might be done or furnished by the subcontractor. The agreement first provided that the materials should be furnished and the work performed "under the direction and to the satisfaction of D. H. Burnham & Co., architects"; and in order that their direction might be effectively exercised, and any ground for dissatisfaction removed, it went on to provide distinctly that the subcontractor must at all times afford safe and proper facilities for inspection of the work by the architects, the contractor, or their representatives, and, upon the supposition that such inspection might disclose defects or other reasons for dissatisfaction, that the improper material must be immediately removed, and the unsatisfactory work must be made right. If the subcontractor neglected or refused to remove or rectify, the contractor could take matters into its own hands, and set things right at the subcontractor's expense. Nothing was required of the architects or of the contractor, except that they should express their dissatisfaction in a specified manner, namely, by notice in writing, in order no doubt to avoid disputes. In other respects their power was practically without limit, and was ample to protect the interests of the contractor and the owner to the fullest extent. Having such a power, it was the plain duty of the architects and of the contractor to exercise it as the work went on. If they saw material being used that was not according to the specifications or did not satisfy their judgment, they should have ordered it taken out, and should have enforced the order, instead of confining themselves to complaint and criticism, rather than availing themselves of the ample remedy which was always at hand.

Neither does this contract make the certificate of the architects or any other person a condition precedent to recovery, as may be seen at once by reading articles 10 and 11, in which alone this subject is referred to. Article 10 makes the certificate of the contractor's superintendent or of the architects necessary before any installment shall be paid while the work is going on, but says nothing whatever about a final certificate or its effect. No doubt, a final certificate was

contemplated by the parties, but it is only referred to incidentally. Article 11 speaks of it once, but nothing is said about it there, except that it, and it alone, shall be conclusive evidence of the performance of the contract; the chief purpose of the article being to guard against the danger that partial payments might be regarded as evidence of performance in some degree, or be considered as an acceptance of defective work or improper material. In the cases referred to by the plaintiff in error the certificate of the architect or other official was made necessary by the contract, as an examination of these decisions will show. Here, while the contract, by implication, declares that, if the subcontractor shall obtain a final certificate (from whom is not stated, but, we may assume, from the superintendent or the architects), performance is to be conclusively presumed, there is not a word concerning the effect of the subcontractor's failure to obtain the certificate. If the parties have not made such failure a bar to recovery, it is certain that the courts will not insert the term into the contract by mere implication.

The scope of the contract being thus limited, in our opinion, the vital question was whether the subcontractor had fulfilled his contract according to the plans and specifications, and, upon the evidence, this was for the jury to determine. Upon this point the instructions of the learned judge of the circuit court were unexceptionable, and, indeed, are not complained of by the plaintiff in error. Under this contract, we do not think that the question properly arises whether the expressed dissatisfaction of the architects was reasonable or unreasonable, but no harm was done to the plaintiff in error by submitting that question to the jury.

The judgment is affirmed at the costs of the plaintiff in error.