## THOMPSON–STARRETT CO. v. LA BELLE IRON WORKS.

(Circuit Court of Appeals, Second Circuit. February 14, 1927.)

No. 144.

1. **Appeal and error ⚌850(2)—Court's adoption of referee's report, on stipulation for reference to hear and report, held equivalent to trial on stipulation waiving jury, and reviewable as such (Comp. St. §§ 1587, 1668).**

Where case was, on written stipulation, referred to referee to hear and report evidence for action of District Court, and court adopted findings of referee as his own after an examination of the evidence, he tried cause under Rev. St. § 649 (Comp. St. § 1587), as though written stipulation had merely waived jury, and his decision was reviewable, under section 700 (Comp. St. § 1668).

2. **Appeal and error ⚌850(2)—Court, in deciding case on referee's report under reference, without written stipulation, acts as arbitrator, and trial is not by court without jury (Comp. St. § 1587).**

Where reference is not under written stipulation under Rev. St. § 649 (Comp. St. § 1587), court, in deciding case on referee's report, acts as arbitrator, and trial is not by court without jury under such section.

3. **Appeal and error ⚌850(2)—On review of case tried without jury, evidence cannot be considered, except as it is involved in alleged erroneous rulings (Comp. St. §§ 1587, 1668).**

Under Rev. St. § 700 (Comp. St. § 1668), where trial of law action is had before court without jury under section 649 (Comp. St. § 1587), evidence cannot be considered by reviewing court for any purpose other than as it is involved in alleged erroneous rulings, and question whether findings are against weight of evidence cannot be considered.

4. **Appeal and error ⚌268(2)—Whether any evidence supports finding on trial without jury may be reviewed as question of law, if exceptions are taken during trial (Comp. St. §§ 1587, 1668).**

Where action at law is tried by court without jury, under Rev. St. § 649 (Comp. St. § 1587), question whether there is any evidence to support finding, considered as question of law, may be reviewed under section 700 (Comp. St. § 1668), if presented to trial court during progress of trial and ruling secured, to which there is an exception.

5. **Appeal and error ⚌268(2)—Exception that special findings are not supported by evidence, taken before final action by court, is reviewable, as taken "in the progress of the trial" (Comp. St. §§ 1587, 1668).**

Where action at law is tried by court without jury under Rev. St. § 649 (Comp. St. §

1587), exception that special findings are not supported by any evidence, taken before final action by trial court; is an exception to rulings made "in the progress of the trial," reviewable under section 700 (Comp. St. § 1668).

6. **Appeal and error ⚌850(3)—Opinions of referee or trial court, on trial without jury, are not "special findings," for purposes of review (Comp. St. §§ 1587, 1668).**

Opinions of referee or trial court, on trial without jury, under Rev. St. § 649 (Comp. St. § 1587), are not special findings authorizing review under section 700 (Comp. St. § 1668) of whether facts found justified judgment, and whether any evidence supports findings, to which exceptions on that ground were taken.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Special finding.]

7. **Appeal and error ⚌266(2)—Exceptions to referee's report may be considered exceptions to rulings of District Court sitting without jury "in the progress of the trial" (Comp. St. §§ 1587, 1668).**

Though, strictly speaking, exceptions to referee's report are not exceptions to rulings of District Court "in the progress of the trial" without a jury, under Rev. St. § 649 (Comp. St. § 1587), they may be considered as such for purposes of review under section 700 (Comp. St. § 1668).

8. **Contracts ⚌292—That owner's superintendent was self-willed and prejudiced held not to show lack of good faith in being dissatisfied with contractor's performance.**

Where there were numerous defects in contractor's work under cost plus contract, providing that work should be done to satisfaction of corporate owner's general superintendent, fact that superintendent might have been self-willed and prejudiced was not inconsistent with actual belief that work was not properly done under contract, nor did it show that he was not in good faith dissatisfied with contractor's performance.

9. **Contracts ⚌282—Promisee cannot recover, where promisor is in fact not satisfied with work contracted to be satisfactory, even if he ought to be satisfied.**

If promisor is in fact satisfied with performance of contract required to be performed to his satisfaction, he must pay, though he is not satisfied with his bargain, and if he refuses to inspect work, or exercise real judgment, he prevents performance and excuses condition; but if he does examine work, and in fact does not believe that it complies with contract, promisee cannot recover, even though promisor ought to be satisfied.

10. **Contracts ⚌282—Owner's failure to require replacement of unsatisfactory work held not to show he was satisfied, where he unequivocally stated dissatisfaction.**

Under construction contract, providing that work was to be done under direction of owner's superintendent, who was given right to condemn and require replacement of any part of work, and making contractor liable for year after completion to remedy defects, *held*, that superintendent could not be held to be satisfied with what he did not condemn, where he un-

equivocally asserted dissatisfaction during performance of contract, even if he failed to specify defects; such provisions being for owner's benefit, and not obligations.

**11. Contracts ⚖══346(8)—Allegations in building contractor's complaint of performance and owner's waiver of departure held not to raise issue of prevention.**

Allegations of performance in building contractor's complaint, except as thereinafter mentioned, and that owner approved departure from contract and waived any claim because of variance, *held* not to raise issue of prevention, in absence of allegation of prevention in complaint.

**12. Contracts ⚖══305(2)—Owner, continuously expressing dissatisfaction with work under cost plus contract, held not estopped to deny satisfaction by taking over houses, tools, and material.**

Where mining company's superintendent continuously expressed dissatisfaction with method of doing work under cost plus contract, and refused to pay balance claimed to be due under contract, company was not estopped to deny that contractor performed to its satisfaction, because it took over houses, materials, and tools without protest.

**13. Contracts ⚖══305(2)—That owner took over houses, material, and tools before completion of cost plus contract held not inconsistent with refusal to pay because contract not performed.**

That owner took over houses, material, and tools before completion of work under cost plus contract *held* not inconsistent with its repudiation of liability for price, where it did not thereafter prevent contractor from completing work, even if taking of materials and tools was wrongful, since it was under no obligation to pay before complete performance.

**14. Contracts ⚖══278(1)—Promisee of conditional promise runs chance of losing what he has done, if he fails to fulfill condition, and cannot be relieved of promise.**

Promisee of a conditional promise always runs chance of losing what he has done, if he fails to fulfill condition, and, when he puts his labor on promisor's land, promisor will be the gainer, and, though such contracts must not be narrowly construed, parties should be confined to their bargains.

Manton, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Action by the Thompson-Starrett Company against the La Belle Iron Works. Judgment for defendant, dismissing complaint, and plaintiff brings error. Affirmed.

The action was upon the defendant's guaranty of the performance by the Consumers' Mining Company of a contract between that company and the plaintiff, a contracting company, for building 175 workmen's houses on the land of the mining company in Pennsyl-

vania. The defendant controlled the mining company, owned substantially all its stock, and the officers of the two were in the main identical; it may be assumed that to whatever the mining company did the defendant agreed. In the contract, dated September 4, 1918, the mining company employed the plaintiff to provide labor and materials and direct the construction, and the plaintiff promised to put up the houses "in a skillful and workmanlike manner and at the lowest cost consistent with good workmanship and the quality of the materials contracted for." The plaintiff, except in the case of small purchases, was to get the written approval of the company's general superintendent before subletting any part of the work, and this approval bound the company. The third article read as follows: "The work included in this contract is to be done under the direction and to the satisfaction of the general superintendent of mines." The plaintiff promised in article 4 at all times to provide proper facilities for the superintendent to inspect the work, and within 24 hours to remove all that he might condemn. It also promised in article 7 that all the material and workmanship should be in accord with the specifications, and that it would make good any defect discovered within a year after completion. The company promised, in article 8, to pay the plaintiff the "actual cost of the work" plus a profit, which eventually was fixed at 6 per cent., though the contract originally provided otherwise. Payments were to be made, by article 9, on the 10th of each month for the month preceding upon the superintendent's certificate; final payment within 30 days "after substantial completion of the work." The contract, by article 13, provided in detail what should be included in the cost to be charged, and concluded with an arbitration clause.

The plaintiff started upon the work early in September, though the contract was not formally executed till December 9th. On March 5, 1919, 64 of the 175 houses were withdrawn by mutual consent, owing to difficulties which developed in the site chosen by the company, but the remaining 111 were substantially completed within a year, and delivered by the plaintiff to the company on September 18, 1919, under circumstances which will be later set forth.

Early in the work the superintendent evinced much dissatisfaction with the estimated cost of the houses, which he had expected to be much less; he refused to certify the plaintiff's monthly requisition of February 1st, and never certified any other. What was the reason for this refusal, whether be-

cause he was in fact dissatisfied with the plaintiff's methods and construction, or only with the cost, whether because he was piqued because of his disappointment at the higher cost, and refused to make an honest judgment, and what were the legal results of his refusals, were all the subject of much controversy at the trial. Notwithstanding his declared dissatisfaction, the company paid the plaintiff its requisitions for all months up to June, in all about $590,000, when it refused to pay anything further. As the plaintiff went on to complete the houses during June, July, August, and September, there remained unpaid a balance which, with the commission, came to $128,000, and this was the subject of the suit.

The complaint alleged the making of the contract, the defendant's guaranty, and that the plaintiff had "duly performed each and every the terms and conditions thereof on its part to be performed, except in so far as said terms and conditions were waived as hereinafter alleged." After several allegations as to modifications in the work to be done, and other matters not necessary to mention, it alleged that the company and the defendant had "approved and ratified any departure from the terms of the said contract, * * * and * * * waived any claim that existed or might exist by reason of any variance between the contract * * * and the work and materials * * * furnished by the plaintiff." The defendant answered, denying, among other matters, the performance and the waiver, and setting up several defenses, not necessary to discuss.

At the joint request of both sides, the District Court appointed an auditor to prepare the proofs for a jury. Numerous hearings took place, covering the whole prosecution of the work and the conduct of the superintendent, and after the evidence had been substantially completed the parties filed a written stipulation that the auditor should be made a referee. The court, following the language of the stipulation, appointed him "to take the testimony and proofs of the respective parties, ascertain the facts, and make special findings," which he was to report to the court. It further ordered that all the rulings theretofore or thereafter made by him, and all proceedings before him, should have the same effect as though taken in court "without a jury, and upon a written waiver of trial by jury, subject, however, to review by this court and by the appellate courts on appeal, writ of error, or otherwise."

The referee filed a single document, entitled "Opinion and Findings," which he began with the words, "I, the said referee, respectfully report as follows." The first part he headed his "Opinion," a very extended and discursive consideration of the facts and the law, 120 pages in length; the second was divided into 28 findings of fact and 2 conclusions of law. At the request of the plaintiff he made 30 more findings, and 50 or more at the request of the defendant. The findings are too long to set forth in extenso. Their substance was that the plaintiff had not performed the work to the satisfaction of the company's superintendent, though it had in fact performed it in accordance with the contract and specifications, at "fair and reasonable" cost. He recommended that the complaint be dismissed. The District Court confirmed the findings and entered judgment dismissing the complaint, to which this writ of error was taken.

Eidlitz & Hulse, of New York City (Charles H. Tuttle, Harry N. French, and Frederick Hulse, all of New York City, of counsel), for plaintiff in error.

Louis Marshall, of New York City, W. D. Stewart, of Pittsburgh, Pa., and Leonard Acker, of New York City, for defendant in error.

Before HOUGH, MANTON, and HAND, Circuit Judges.

HAND, Circuit Judge (after stating the facts as above). [1] This cause was upon written stipulation referred to a referee, to hear the evidence and report it back for the action of the District Court. When the judge, upon the coming in of the report, adopted the findings of the referee as his own after an examination of the evidence, he tried the cause under Revised Statutes, § 649 (Comp. St. § 1587), quite as though the written stipulation had merely waived a jury. Pneumatic Scale Co. v. Mainwaring, 286 F. 378 (C. C. A. 2); Philadelphia Casualty Co. v. Fechheimer, 220 F. 401, Ann. Cas. 1917D, 64 (C. C. A. 6); Board of Com'rs v. Sherwood, 64 F. 103 (C. C. A. 8); Cleveland v. Walsh Cons. Co., 279 F. 57 (C. C. A. 6). It is quite true that a reference "to hear and determine," even on written stipulation, is not such a trial. Chic., Mil. & St. P. Ry. v. Clark, 178 U. S. 353, 20 S. Ct. 924, 44 L. Ed. 1099; David Lupton's Sons v. Auto. Club of America, 225 U. S. 489, 495, 32 S. Ct. 711, 56 L. Ed. 1177, Ann. Cas. 1914A, 699; Roberts v. Benjamin, 124 U. S. 64, 71, 74, 8 S. Ct. 393, 31 L. Ed. 334; Paine v. Central Vermont R. R., 118 U. S. 152, 158, 6 S. Ct. 1019, 30 L. Ed. 193. Such cases are in fact tried by an arbitrator, a practice

known to the common law. Hecker v. Fowler, 2 Wall. 123, 17 L. Ed. 759.

[2] Moreover, though the referee does not decide the cause, but only reports to the court, if the consent is not by written stipulation as provided in section 649, while the court decides the cause, it too acts as arbitrator, and the trial is not under section 649. Shipman v. Straitsville Mining Co., 158 U. S. 356, 361, 15 S. Ct. 886, 39 L. Ed. 1015. It is only when the two conditions coexist that section 649 applies. It has indeed been held that a cause may be referred under the local statute (Tiernan v. Chicago Life Ins. Co., 214 F. 238 [C. C. A. 8]), a practice apparently recognized by us in Parker v. Ogdensburgh, etc., Co., 79 F. 817; but how far this can be reconciled with the decisions of the Supreme Court we need not consider.

Steel v. Lord, 93 F. 728 (C. C. A. 2), Steger v. Orth, 258 F. 619 (C. C. A. 2), and Demotte v. Whybrow, 263 F. 366 (C. C. A. 2), were cases of references to hear and determine; in each we said that no question was presented but of the sufficiency of the findings. They were not therefore trials under section 649. Any language to the contrary in Fifth Nat. Bank v. Lyttle, 250 F. 361, 363 (C. C. A. 2), was an inadvertence. Hudson, etc., Co. v. Warner & Co., 99 F. 187 (C. C. A. 2), was a case like that at bar, where the stipulation was in writing and the reference was only to report. So far as it held by implication that the action of the District Court upon the report was not a trial under section 649, it was overruled by Pneumatic Scale Co. v. Mainwaring, supra. As the case at bar was therefore a trial by the court under section 649, Revised Statutes, § 700 (Comp. St. § 1668), applies to it.

[3-5] Revised Statutes, § 700, prescribes that in trials under section 649, when there are special findings the review is limited to the inquiry whether these support the judgment, and whether there were erroneous rulings in the course of the trial. The testimony cannot be regarded for any purpose other than as it is involved in such rulings, and we have therefore no concern with whether the findings are against the weight of the evidence. Norris v. Jackson, 9 Wall. 125, 19 L. Ed. 608; U. S. v. Fid. & Guar. Co., 236 U. S. 512, 527, 35 S. Ct. 298, 59 L. Ed. 696; Steger v. Orth, supra; Pneumatic, etc., Co. v. Mainwaring, supra; U. S. Fidelity Co. v. Board of Commissioners (C. C. A.) 145 F. 144, 150. The question whether there is any evidence whatever to support a finding, being, however, considered a question of law, may be reviewed, if presented to the court during the

progress of the trial, and a ruling secured to which there is an exception. R. S. § 700. In the Eighth Circuit the practice has long been that the party aggrieved must request the court before its report is filed to make rulings of law. Mercantile Trust Co. v. Wood (C. C. A.) 60 F. 346, 348, 349; U. S. Fidelity, etc., Co. v. Board of Commissioners (C. C. A.) 145 F. 144, 151; Seep v. Ferris-Haggarty, etc., Co. (C. C. A.) 201 F. 893, 896; Wear v. Imperial Window Glass Co. (C. C. A.) 224 F. 60, 63; First National Bank of Ardmore v. Litteer (C. C. A.) 10 F.(2d) 447. We can only understand this as requiring the party to request a ruling that a specific finding has no evidence to support it. On the other hand, Chief Justice Taft, while Circuit Judge, said in Humphreys v. Third National Bank (C. C. A.) 75 F. 852, 855, 856, that to bring up the question whether a special finding had any evidence in its support, the party may except to it; it being an absurdity to ask a court to charge itself. This language has received the sanction of the Supreme Court in Fleischmann Co. v. U. S., 270 U. S. 349, 356, 46 S. Ct. 284, 70 L. Ed. 624, though, like the original, only in a dictum. It seems to us a needless and idle form to require the party aggrieved to request a ruling that putative future findings, or special findings already made, are without any evidence, and we regard an exception taken on that ground before final action of the court an exception to rulings made "in the progress of the trial."

[6] Our review here would therefore be limited to whether the findings of fact justify the disposition of the cause, and, if the exceptions were adequate, whether there is any evidence to support any finding to which exception was taken on that ground. In passing on these questions we are confined to the findings properly so called, and may not look at the referee's opinion or the court's. Fleischmann Co. v. U. S., 270 U. S. 349, 355, 46 S. Ct. 284, 70 L. Ed. 624; British Queen Mining Co. v. Baker Silver Mining Co., 139 U. S. 222, 11 S. Ct. 523, 35 L. Ed. 147; Raimond v. Terrebonne Parish, 132 U. S. 192, 10 S. Ct. 57, 33 L. Ed. 309; U. S. v. Stockyards Co., 167 F. 126, 127 (C. C. A. 8); China Press, Inc., v. Webb, 7 F.(2d) 581 (C. C. A. 9).

The necessity of the rule could not be better illustrated than by the case at bar. The referee's opinion was not, and should not have been, a statement of the "ultimate facts." It was an extraordinarily impartial and capable discussion of the evidence, giving its substance, and weighing and balancing the inferences to be drawn from it. Such a document is exactly what the Supreme Court has

set its face against as the equivalent of findings, even when there were no findings properly so called, and when the result was to leave nothing for review but the judgment roll. To treat such an opinion as part of the findings, when there are such, called by that name and expressly so intended, would be wholly unwarranted.

[7] Strictly, the plaintiff took no exceptions which raise any question in this court. The exceptions to the referee's report were not exceptions to the rulings of the District Court, and the exceptions taken to the rulings of the District Court confirming the referee were taken after judgment, and can by no theory be regarded as made "in the progress of the trial." It seems to us, however, unduly strict not to treat the exceptions taken to the referee's report as exceptions to the rulings of the District Court in the progress of the trial, and we shall therefore consider them as such. The exceptions to the referee's findings respecting the superintendent's conduct do not raise the question whether they were without any evidence, in this respect differing from the exceptions taken, too late, to the action of the District Court in confirming the referee. In no view, therefore, have we before us more than the question whether the findings support the judgment.

[8] Nevertheless, as to the findings regarding the superintendent's conduct and that he was not in good faith satisfied with the plaintiff's performance, both as respects method and construction, we think that there was supporting evidence. That he did express himself as generally dissatisfied is, indeed, not disputed. There were numerous imperfections of construction which might have been the occasion for his dissatisfaction with that, as well as with the general conduct of the work. These both the referee and the District Court were at pains to point out in their opinions. Given such a possible basis for dissatisfaction, it would be substantially impossible to disturb the finding on the theory that nothing supports it. It must in the end depend more upon personal observation than any other single factor, which is necessarily lost in print. That he may have been self-willed and prejudiced is not inconsistent with an actual belief that the work was not being done as the contract required. He was not in any sense, as the plaintiff appears to suppose, an arbiter chosen by both sides because of his presumptive impartiality. He was the representative of a party to the contract, the party itself for the occasion, which could only act by an agent. As such, impartiality could not be expected of him, though honesty could.

Thus, even if the exceptions had justified an inquiry into the basis for the findings, we should not disturb them.

Coming then to the merits, if it were necessary, we should disagree with the referee in limiting the third article of the contract to the question whether the houses when completed conformed to the specifications, and excluding whether the methods employed resulted in the lowest cost consistent with good workmanship. It is true, as he says, that, in the case of a building contract at a fixed sum, the owner can have no interest in the extravagance or economy of the contractor's methods of work; his only interest is in what he gets, since what he pays is settled in advance. But we are unable to see the relevancy of that consideration in the case of a "cost plus" contract, in which the owner is equally interested in the contractor's methods as in his construction. He is, of course, concerned that he should get the work which he specifies; but he is as much concerned with the way it is done, for that controls the cost. Indeed, since bad construction can be remedied by money, his interest as to each is in the end precisely the same. Literally, but only so, the phrase "work to be done" has nothing to do with the cost. Work that is to be done under a man's direction is certainly to be managed and conducted in ways that he approves. If he thinks it done wastefully, it is not done to his satisfaction, quite as much as though the result was not to his liking. We can see no justification for reading the clause in such a context as limited to only a part of what the owner must reasonably have thought necessary to his protection.

Nor should we agree that a contractor is more exposed to abuse in one respect than in the other. The quality of his workmanship is quite as open to captious objection as the extravagance of his methods. The owner, on the other hand, needs as much protection in the one case as in the other; indeed, it is even more difficult for him later to challenge the way in which the work was done, which necessarily must have disappeared, than the actual product which remains for comparison with the specifications. On the first issue he is peculiarly at the contractor's mercy, whose employees collectively can make a much stronger case than the fewer inspectors whom the owner will employ. It is quite true that such contracts are hazardous, but we must construe them so as to give that protection which on their face they seem intended to secure.

Therefore we should hold, if the facts required it, that the phrase "the work * * *

is to be done under the direction and to the satisfaction" of the superintendent required the plaintiff to satisfy him, not only that it performed its covenant in the seventh article that "all material and workmanship delivered under this agreement shall be strictly in accordance with the plans and specifications," but that it also performed its covenant in the first "to erect and construct said buildings * * * at the lowest cost consistent with good workmanship and the quality of materials contracted for." Since, however, the cause was disposed of upon the more limited interpretation, and since the findings correspond with that theory as well as with ours, we need not positively hold that the broader is the true one. The result is the same in either case, though the questions of estoppel and prevention, considered below, are relevant only to the limited interpretation. On the other hand, it was not an absolute condition upon any recovery whatever to satisfy the superintendent as to the methods employed; that only went to its amount.

[9] The questions presented by such a provision, both under federal decisions and those of Pennsylvania, the place of performance, is whether the promisor was in fact satisfied with the performance, and not whether he ought to have been. Goltra v. Weeks, 271 U. S. 536, 548, 46 S. Ct. 613, 70 L. Ed. 1074; In re George M. Hill Co., 123 F. 866 (C. C. A. 7); Cope v. Beaumont, 181 F. 756 (C. C. A. 3); J. H. Sullivan Co. v. Wingerath, 203 F. 460 (C. C. A. 2); American Music Stores v. Kussel, 232 F. 306, L. R. A. 1916F, 882 (C. C. A. 6), construing New York law; Robinson v. U. S., 251 F. 461 (C. C. A. 2); Corgan v. Lee Coal Co., 218 Pa. 386, 67 A. 655, 120 Am. St. Rep. 891, 11 Ann. Cas. 838; Morgan v. Gamble, 230 Pa. 165, 79 A. 410; Kann v. Bennett, 234 Pa. 12, 82 A. 1111. Such words as "fraud," "good faith," "whim," "caprice," "arbitrary action," and "legal fraud" appear to us to obscure the issue. The promisor may in fact be satisfied with the performance, but not with the bargain, in which case, of course, he must pay. He may refuse to look at the work, or to exercise any real judgment upon it, in which case he has prevented performance and excused the condition. But if he does examine what has been done, and, after comparing it with the stipulations, in fact does not believe that it is truly described by them, the promisee, who necessarily has the burden, has not succeeded in fulfilling the condition, and cannot recover. So far as the words so commonly used describe the promisor's unwillingness

to judge, or the untruth of what he says about his conclusion, they are, of course, appropriate, though not well adapted to define the question; but, if they mean to add anything to the issue of fact, they seem to us to be wrong.

[10] The plaintiff argues that the fourth and seventh articles of the contract modify the third. It says that, since the work was to be done under the direction of the superintendent, since he could condemn any part of it and require its replacement, and since the plaintiff for a year after completion remained liable to remedy defects which should appear, the contract must be understood to mean that he was in fact satisfied with what he did not condemn, though he may have unequivocally asserted the contrary during its performance. The Circuit Court of Appeals for the Third Circuit, indeed, did hold as much in Fuller v. Young, 126 F. 343; but we cannot accede to the doctrine. The result is altogether to excise from the contract the satisfaction clause, because the rights of the parties are left precisely as though it were not present. It seems to us, on the contrary, that the fourth and seventh articles of the contract were privileges accorded the owner, not obligations, and that, if he was not in fact satisfied, he was not required to exercise his power and condemn the work.

Whether the absence of any expression of dissatisfaction as the work proceeded might be paramount evidence of satisfaction, whether it might even estop him if the work went on, is another matter, on which we do not pass. Town of Packwaukee v. American Bridge Co., 183 F. 359 (C. C. A. 7). It may be true that the superintendent did not specify any defects in workmanship, nor did the company transmit any to the plaintiff, and that both contented themselves with general expressions of dissatisfaction. The findings are silent on the point, and we have no right to go behind them, there being no requests which raise it. It would make no difference, if there were. The expressions of dissatisfaction were not in terms confined to the methods employed, and were apt to cover, not only these, but the conformity of the work to the specifications. On their face the plaintiff was bound either to ascertain on what specifically they were based, or to accept them as broadly as they were made. Just what in fact took place, and how far they may have been limited in talk, we have no means on this record of knowing.

[11] The plaintiff, however, insists that, even if it had not performed, the company prevented, and so excused, further performance

by taking over the houses, and thereafter excluding it from completing them to the company's satisfaction. A strict construction of the complaint would scarcely allow this view to be taken of it. It pleads performance, except as thereinafter mentioned, and there is no mention of prevention. Later it pleads that the defendant approved any departure from the contract, and waived any claim because of a variance between it and the work. This, too, would hardly admit proof of prevention, and we can find nothing in the requests, exceptions, or assignments of error which raises the point, unless it be in the equivocal word "waiver." If that, which covers so much ambiguity, can cover this, still the findings do not justify the position.

The referee found that on September 18, 1919, the plaintiff delivered the houses as a substantial performance, and the company accepted them, and that, except for accounting adjustments, plaintiff's work then terminated (finding 12). This finding incorporates the letter sent by the superintendent that day, in which he said that the company would not require the services of the plaintiff any longer, but would itself take care of the unfinished items, expecting the plaintiff to coöperate with respect to subcontracts not completed or adjusted. This letter also admits that certain undisclosed tools, supplies, and materials had been taken over, and asserts that the houses were to be thereafter completely in the company's care. At this time they were in fact ready for use and occupancy (plaintiff's request 43), though there were certain unfinished items. These are all the findings on which the claim of prevention can rest.

Whether the plaintiff delivered the houses unwillingly, because the company demanded it, or whether the delivery was with its consent, does not appear, and we have no right to assume that it had not done all it meant to do. If not, mere delivery was in no sense inconsistent with the plaintiff's completing what had not yet been done to the company's liking. The omission of the unfinished items, if by the consent of both, was no more than had occurred already, in respect of 64 houses, or than took place at this time in respect of the sewer and water services. So far as appears, the plaintiff might still have done such further work as it chose to make the houses conform. Indeed, if we were allowed to look into the evidence, it would appear that through subcontractors it actually did do further work, for example, in respect of the plastering. Certainly there is no warrant for saying from all this that the company stopped the work, and the contention is apparently an afterthought.

[12] The next point is that, by taking over the houses, and with them the tools and materials on the ground, as well as by receiving from the subcontractors certain added materials after September 18th, the company became estopped to deny that the plaintiff had performed to its satisfaction. Assuming that this was comprised within the eighteenth article of the complaint, the point is not in our judgment valid. As to the materials delivered by subcontractors after September 18th, it must rest upon the plaintiff's tenth request, which is, however, indefinite as to time. However, the materials and tools on hand on that day raise the point quite as well as any received later.

As a true estoppel it must depend upon the implication that the company was in fact satisfied, and upon the plaintiff's action to its detriment upon that understanding. The company had repeatedly declared that it was not in fact satisfied, both expressly when it made payment after January, and most effectively when it refused payment altogether after May. Nothing had happened meanwhile to indicate a change of heart, unless it were the inspections in August and September (finding 13). The superintendent and his assistants were present at these, and they pointed out some details for correction; but there is no finding that they expressed themselves as satisfied if these were remedied, and the referee refused to make findings (44, 45, 46, 48, 50, 51), designed to show that the superintendent was in fact satisfied, or had expressed himself so, if these were remedied. In the face of the continuous discontent with method, if not with construction, which had gone before, if the plaintiff supposed that the situation had changed, its assumption was gratuitous. In delivering the houses, materials, and tools, so far as appears without protest, it did not, therefore, act upon the faith of an apparent change in the plaintiff's position.

[13] The argument appears, however, to go further, and to rest, not upon estoppel, properly speaking, but upon the inconsistency in law of the company's acceptance of the property, while denying any responsibility for the price. As to the houses it is hard to see how it could have done otherwise than accept, so long as it did not accompany acceptance with any expression of satisfaction. But this does not dispose of the claim in respect of the materials and tools. To state the argument as strongly as we can: The contract alone gave the company any right to the materials and

tools, which under its thirteenth article were put in the same class. To take them over was therefore to assert a right under it, which was inconsistent with the repudiation of all liability for the price.

But there was no inconsistency in law in the company's position. There might, indeed, have been, had it prevented the plaintiff from completing; but it had not. Its refusal to pay was not a repudiation, because it was under no obligation to pay; the plaintiff not having performed. True, it was not entitled to the materials and tools under the contract, if the plaintiff had not delivered them; but, if it chose to do so, any resulting obligation depended upon that transaction, and was independent of the contract. Even if it had taken them wrongfully, it would not have affected that obligation, though it raised an independent liability. So far as concerned the contract, it stood consistently upon its rights not to pay until the plaintiff should perform. In that it had been consistent, if grasping, and performance was not completed by taking over materials and tools, even if it was not entitled to them.

[14] That the case is a hard one goes without saying. The plaintiff is defeated in a large recovery by what was apparently the obstinacy and prejudice of the company's superintendent—we speak from the opinion. But it is a misnomer to call this a forfeiture, as the brief repeats on almost every page. The promisee of a conditional promise always runs the chance of losing what he has done, if he fails to fulfill the condition, and when he puts his labor on the promisor's land, the promisor will be the gainer. There is no injustice in that, if he has agreed to bring to pass the condition. It is quite true that we must not read such contracts narrowly, for they are severe; but, once understood, it is as prime a consideration as in any other case that the parties should be confined to their bargain.

Judgment affirmed.

MANTON, Circuit Judge (dissenting). The contract sued on is for service and the furnishing of materials and labor on a cost plus basis in the construction of houses. The owner agreed to pay such costs incurred by the contractor in performance of the construction work plus a fee of 6 per cent of the cost. The action seeks to recover an unpaid balance of $128,351.75.

The main defense presented to us is that paragraph III of the contract, providing that "it is understood and agreed by and between the parties hereto that the work includ-

ed in this contract is to be done under the direction and to the satisfaction of the general superintendent of mines," was not complied with, in that the plaintiff in error was unable to satisfy the mine superintendent. The contract provided, among other things, in paragraph IV, that "the contractor agrees on 24 hours' notice to remove all materials condemned by the superintendent whether worked or unworked, and to take down all portions of the work which the superintendent shall condemn as unsound and improper, and to make good all work damaged or destroyed thereby within the scope of the contract," and in paragraph VII that the materials and workmanship shall be strictly in accordance with the plans and specifications, and any defect, patent or discoverable by the exercise of reasonable care and the usual tests, will be repaired or finished within one year after the completion of the work. Paragraph VIII provides that the estimated cost of the work is to be determined from the itemized estimate of costs prepared by the contractor, based on plans and specifications prepared by the architect, to be approved in writing by the superintendent of mines, and that "nothing herein shall be construed as binding the contractor to complete the work within the estimated cost, it being understood that said estimate is made for the sole purpose of determining the amount of the contractor's profit." And paragraph XII provides that nothing shall be construed as binding the contractor to finish the work within any specified time and due allowance shall be made for delays of any kind affecting the progress of the work.

The findings of fact made by the referee should be accepted, and the question open for our review is whether there are any errors of law in the judgment rendered by the court below. David Lupton's Sons v. Automobile Club of America, 225 U. S. 494, 32 S. Ct. 711, 56 L. Ed. 1177, Ann. Cas. 1914A, 699; Fleischman Co. v. United States, 270 U. S. 355, 46 S. Ct. 284, 70 L. Ed. 624; Aronstam v. All-Russian Central Union, etc. (C. C. A.) 270 F. 460. The referee's findings, approved by the District Court, established these facts: That the plaintiff in error took hold of the contract in good faith and pressed the work to completion with energy; there was no bad faith, lingering delays, or soldiering of any character, and no padding of the cost; and it has been found that the moneys requested for payment were expended for labor and services. Further, it is found that the work was done in a skillful and workmanlike manner in conformity with the plans and specifications furnished, and that as a result there was a

substantial performance of the contract. The contract provided that "final payment, including the full amount to be paid under this contract, shall be made within 30 days after substantial completion of the work." There is a finding that the cost of the work did not exceed the fair and reasonable value of performing the same, and that the fair cost of the services unpaid for is the amount sued for herein. The contract provides for inspection by the superintendent and that the plaintiff in error would have opportunity to correct the defects pointed out in his complaints. There is a finding that such defects as were pointed out were supplied, corrected, and repaired prior to September 18, 1919, and further that at no time was there a refusal to correct any work the superintendent requested to be corrected.

After September 18, 1919, there were no requests made. On that day, a letter was written stating in effect that the plaintiff in error need not work further on the job and that the defendant in error would take care of unfinished items. There is a finding that, on every occasion when defective work was pointed out, the plaintiff in error carried out the superintendent's direction to the letter. The final inspection of the work resulted in a finding that the superintendent took an active part in the work and that he ought to have been satisfied. When the letter of September 18, 1919, was written with the authority of the mining company, putting an end to the services of the plaintiff in error, it was a breach of the contract in depriving the plaintiff in error of the opportunity to finish its work on a cost plus basis.

It made no difference to this superintendent, under the contract, what the cost of the work, if it was honestly incurred. The parties did not contract to satisfy the superintendent as to the cost. Provision as to that is found in paragraph I, as follows: "And the contractor agrees to accept said employment and to erect and construct said buildings and improvements for the owner in a skillful and workmanlike manner and at the lowest cost consistent with good workmanship and the quality of materials contracted for, it being understood that the contractor has had a large experience in the construction of such work and the purchase of materials therefor, and will give to the owner the full benefit and advantage of its skill and experience in these lines."

No time was set for the completion of the work. And it was not within the power of the superintendent of mines, in breach of the contract, to discharge the plaintiff in error. He could, of course, have severed the relationship only when the work was completed. Indeed, after writing the letter on September 18, 1919, the mining company completed some unfinished items, employing the subcontractors who had contracted with the plaintiff in error, and using the materials, tools, and supplies which the plaintiff in error brought to the job.

There were problems as the work progressed. The most prominent of these was the selection of the site, referred to as plot No. 2, which had an unsuitable foundation upon which to build. Some of the work here was abandoned. The selection was made by the superintendent; the directions for the work in the location were given by him.

The superintendent of mines, in his correspondence and statements, conceived the idea that the work should not have cost more than $500,000, whereas in fact it far exceeded that sum. Basing all his claims of dissatisfaction upon the cost above that figure, he reached a state of mind which resulted in arbitrary action. As the referee said: "The superintendent appears to have felt a personal responsibility for the selection of the sites for the houses," which proved to be unsuitable, and further said that, at the time of this discovery, the superintendent's attitude toward the plaintiff in error was "one of obvious bias and even extreme hostility." He further said in his report: "The estimate sent in by the plaintiff on January 6, 1919, exceeded so greatly what the owner and the superintendent and architect had expected the work to cost that the superintendent, who no doubt felt responsibility to his superiors for the expected cost of $500,000, was greatly alarmed, and from that time on his attitude toward the plaintiff became strained and, finally, decidedly hostile." The prevailing opinion says: "The plaintiff is defeated in a large recovery by what was apparently the obstinacy and prejudice of the company's superintendent— we speak from the opinion."

In all the findings below, there is an absence of expression of dissatisfaction as to any particular part of the work prior to September 18, 1919. Such as were listed from time to time as requiring completion or repair were found to have been corrected. The site and plot No. 2 were ultimately abandoned by direction of the superintendent and the plaintiff in error was exonerated from blame or fault in the endeavor to build upon it by the findings of the referee. With the findings thus made, there is nothing to support the general statement in the finding 15 that the superintendent was in good faith dissatis-

fied. Such a finding so stated is meaningless and valueless.

The parties had contracted as to the cost of the work; the contract did not contemplate that the plaintiff in error was to satisfy the engineer as to cost. A cost plus contract never contemplates satisfying misconceived notions as to cost. The cost of the work was uncertain. The parties recognized this in making a cost plus contract. Such a contract is nothing more than a service in the purchase of materials, supply of labor, and in the performance of the work. The idea of the superintendent as to the cost not to exceed $500,000 was an unwarrantable assumption by him of terms of the contract, which the parties did not agree upon. It undoubtedly resulted in bringing to his superintendency arbitrary action. The plaintiff in error was bound to follow the direction of the superintendent under clause 3, paragraph III, and to accede to his demands in the selection of the sites or in the prosecution of the work. The findings amply support the claims of the plaintiff in error that it met all his requirements in this respect, and therefore that it fulfilled the covenants of the contract on its part to be performed.

The duty of the superintendent is made clear by paragraph IV, which gave power to the superintendent or his representatives to make inspection to condemn as unsafe or improper the work improperly performed. And in paragraph VIII it required the work to be done in accordance with the plans and specifications and made plaintiff in error responsible for completion and for defective work within a period of one year after completion. If there were defects indicated by plaster cracks or leaks, plaintiff in error should have had opportunity to make these repairs. To refuse it such opportunity was a breach of the contract obligation. Indeed, the referee found that the superintendent did periodically inspect the houses, list the defects, and required the superintendents of the plaintiff in error and its subcontractors to remedy the defects as they occurred.

Moreover, it appears that, after the plaintiff in error left the work under the circumstances described, the defendant in error approved the accounts of the subcontractors and subsequently paid them all, indicating that this was done in pursuance to the terms of the contract and within the privilege of the contract accorded the plaintiff in error. It likewise points out the ultimate satisfaction of the superintendent with the plaster work. The letter of September 18th does not state that the mining company discharged the

17 F.(2d)—35

plaintiff in error because of dissatisfaction with the work. The acceptance of the subcontractors after that date, at the prices agreed upon for completing the unfinished items, is a conclusive affirmation of the continuance of the contract, and points to the satisfaction of the superintendent with the plaintiff in error's work. Retaining the tools, supplies, and materials is another indication of satisfaction.

The rule of law for this circuit is announced in Sullivan v. Wingerath, 203 F. 460, where the contract provided that the work be performed to the satisfaction of a specified architect. There Noyes, J., said:

"The trial court, in charging in accordance with the request of the plaintiff, correctly stated the law. The case was not one in which the necessity for, or finality of, an architect's certificate was involved. It was simply a case in which the parties had agreed that the work should be done 'to the satisfaction of the architects.' But in such a case the agreement as made must be lived up to. The question is not whether the work ought to be satisfactory but whether it is satisfactory. When parties agree that the question of the performance of a contract shall be left to the determination of a third person, his decision is final, in the absence of mistake, fraud, or arbitrary action amounting to legal fraud."

In Geo. A. Fuller Co. v. Young Co., 126 F. 343 (Third circuit, where this contract was made and performed), where the satisfaction of an architect was required under the terms of the contract, the court pointed out that the provisions of the contract must be read together, and the right to be satisfied may not be isolated and read from the rest of the context, and said:

"If one of the parties to an agreement is permitted thereby to assert dissatisfaction with the other's work and materials, while he continues to enjoy them at a diminished price, to be fixed by himself without appeal, it may be conceded that the contract, although improvident, is not unlawful. But a conclusion so harsh should rest upon clear and plain language, which a positive rule of law requires to be enforced. In our opinion, no such conclusion can be properly drawn from the contract of February, 1901. Its provisions must be read together, and its true meaning can only be gathered by considering the instrument as a whole."

In City of Cleveland v. Walsh (C. C. A.) 279 F. 57, the contractors built a filtration plant under the requirement of final accept-

ance by the director of public utilities. The city contended that because of defects in construction it could refuse payment, but the court, through Denison, J., said:

"The specific defects were unknown during all this period [of six months, during which the city at least took partial possession without complaint], although the city had opportunity to find them; they pertained to matters which had passed the city's current inspection with approval; they were capable of correction by the contractor and the contract contemplated such correction rather than a general refusal without opportunity given for perfecting."

See, also, Cope v. Beaumont (C. C. A.) 181 F..756.

It will not do to merely bluntly announce that there was good faith in the dissatisfaction of this superintendent. Dissatisfaction must be founded on cause. It may not be arbitrary or unreasonable. If it is arbitrary action, it amounts to a legal fraud.. It was not the duty of the superintendent to fix the prices, and his views as to the cost of the work are unimportant, because the parties had contracted otherwise. As long as this contractor entered upon the service and work for the owner in a skillful and workmanlike manner and at the lowest cost consistent with good workmanship and the quality of materials contracted for, the views or action of a superintendent on the matter of cost were immaterial. The findings support the claim of the plaintiff in error that the work was done in accordance with this provision of the contract under the direction of the superintendent, and that is sufficient to support this action for the unpaid balance.

The judgment should be reversed.