**FIRST NATIONAL BANK OF CHICAGO, Plaintiff–Appellee,**

v.

**ATLANTIC TELE–NETWORK COMPANY, Defendant–Appellant.**

**No. 90–3651.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 16, 1991.

Decided Oct. 17, 1991.

Rehearing Denied Nov. 14, 1991.

---

Lynn A. Goldstein (argued), John C. Simons, First Nat. Bank of Chicago, Chicago, Ill., for plaintiff-appellee.

Mary A. Gerstner (argued), Joseph J. Walczak, Burke, Wilson & McIlvaine, Chicago, Ill., John P. Raynor, Richard J. Rensch, Patrick M. Heng, Gilroy, Raynor, Skudlarek & Rensch, Omaha, Neb., for defendant-appellant.

Before BAUER, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.

POSNER, Circuit Judge.

This is a diversity suit for breach of contract, brought by First National Bank of Chicago against Atlantic Tele–Network Co. (ATN); Illinois law applies. The district judge granted First National's motion for summary judgment and entered judgment for some $296,000 in damages, plus prejudgment interest.

The suit is based on two letter offers that the bank sent ATN in December 1986 and that ATN accepted later that month and early the next. The *commitment* letter offered to lend ATN $75 million to buy the Virgin Islands Telephone Company (Vitelco) upon the terms specified in the letter (including that ATN would pledge the stock it bought in Vitelco as security for the loan), as supplemented, however, by the terms of a "mutually satisfactory" loan agreement to be negotiated. The *fee* letter specified a schedule of fees that ATN would pay the bank for various services in connection with the initiation of the loan, over and above interest. The suit is for breach of the fee agreement.

Upon acceptance of the two offers, the bank set about to draft the loan agreement. It inserted in its draft as a condition of the loan that the Virgin Islands Public Service Commission approve ATN's purchase of Vitelco. The bank gave the draft agreement to ATN, which, while claiming that it protested the condition, has stipulated in this lawsuit that it was a reasonable condition— as it plainly was, since the stock of Vitelco was to be the security for the loan. ATN submitted the draft loan agreement to the Public Service Commission with a request to approve the purchase. The Commission turned down the request because of certain terms in the draft agreement that it didn't like, and the bank and ATN sat down to negotiate revisions that would overcome the Commission's objections. ATN, however, believing that the Commission's approval was not actually required, and impatient at the bank's failure to come up with a satisfactory revision of the agreement in time for a hearing at which the Commission was to reconsider ATN's request for approval, broke off the negotiations in April. It obtained substitute financing for the Vitelco purchase from another financial institution, which did not insist on conditioning the loan on the Virgin Islands PSC's approval of the purchase. Later the courts held that such approval *was* required, *Atlantic Tele–Network Co. v. Public Services Comm'n*, 841 F.2d 70 (3d Cir.1988), and ATN sought, and this time obtained, the approval.

The fee letter specifies four fees. First, "A non-refundable fee equal to ¼% [of the loan commitment] ($187,500) will be payable upon acceptance of this commitment." This was paid, but ATN has filed a counterclaim to get it back, which the judge dismissed as part of his judgment for the bank. Second, "A termination fee of ¼% ($187,500) will be payable on February 15, 1987 in the event that the credit facility detailed in the Commitment Letter is not closed by such date." Third, "A commitment fee on the unused portion of the total Commitment of ½% per annum commencing on the day this Commitment is accepted will be payable quarterly in arrears." Last was a closing fee of 1 percent ($750,000), but this never became due because the loan never closed. The judge awarded the bank the termination fee plus the commitment fee through April 8, when the negotiations between the parties ended.

ATN's basic argument is, improbably enough, that the fee agreement, despite its providing expressly for a termination fee— that is, a fee if the loan did not go through—was conditional on the parties' agreeing on the material terms of the loan.

They did not agree, because ATN withdrew its consent to the inclusion of a condition requiring the approval of the Virgin Islands Public Service Commission (however reasonable such a condition might be). Therefore—ATN argues—the fee agreement never came into effect and ATN is entitled to the refund of the nonrefundable fee and is not liable for the termination and commitment fees.

It is unclear, however, that ATN ever rejected the condition. It didn't like it, but it sat down with the bank to negotiate a version of the condition that would be acceptable to the PSC and it has stipulated to the condition's reasonableness. Later it changed its mind because it thought the bank was dragging its feet. But it has made no effort to show that the bank had thereby violated any condition, express or implied, of the contract, thus entitling ATN to rescind its earlier acceptance. There was no fixed deadline for the PSC's approval of the transaction, and while no doubt the bank was under an implicit obligation to act within a reasonable time to produce a revised version of the condition that it wanted, we do not understand ATN to be arguing that the bank actually violated such a condition.

■ All this assumes, though, that ATN accepted (at least initially) the inclusion of a condition requiring it to obtain the Public Service Commission's permission to buy Vitelco; and it no more explicitly accepted than it explicitly rejected it. The law ordinarily treats silence as rejection, not acceptance, of an offer, if that is how the proposal of a term left open in the original contract should be viewed. But that is in general, not in every case. If circumstances make it reasonable (ordinarily on the basis of previous dealings with the offeree) for the offeror to construe silence as acceptance, he may do so. 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 3.15 (1990); *Restatement (Second) of Contracts* §§ 69(1)(b), (c) (1981); *Fineman v. Citicorp USA, Inc.*, 137 Ill.App.3d 1035, 1042, 92 Ill.Dec. 780, 784, 485 N.E.2d 591, 595 (1985); cf. UCC § 2–207. So, while you may not mail out a bunch of offers to strangers and specify in them that silence is acceptance—since most of the offers are likely to be rejected, a rule treating silence as acceptance would impose heavy mailing costs as well as create difficult questions about whether a particular offer had actually been received—you may so specify if you are dealing with someone who, on the basis of your previous dealings with him, you reasonably expect is highly likely to accept the offer. In such a case treating silence as acceptance will actually minimize mailing costs.

Silence in the circumstances of this case might even be deemed a waiver of ATN's alleged contractual right to demand that any term in the loan agreement be satisfactory to it. 2 Farnsworth, *supra*, § 8.5. And probably this case is best viewed not as an acceptance by silence case at all but rather as one of acceptance by conduct (on which more later). ATN didn't just keep mum; it negotiated over the condition and perhaps by doing so indicated that it had accepted it in principle. And the condition was so plainly reasonable given its essentiality to the bank's security that we have trouble understanding how ATN could have defended a refusal to accept it. This would be an additional reason why the bank could presume that it *had* been accepted in the absence of an explicit rejection.

We need not pursue these byways further. There is a deeper problem with ATN's argument. It misunderstands the structure of the contracts. It is no accident that there are two. One is an agreement to make a loan on specified terms, an agreement, however, that is subject to a condition precedent—the working out of additional, mutually satisfactory terms to govern matters left open. The other is an agreement governing the parties' relations during the period of the negotiations necessary to make the loan agreement final—a period during which the bank undertakes to hold $75 million in readiness to make the loan when and if it closes. In exchange for this undertaking ATN promises among other things to pay a commitment fee that has both a fixed and a variable component (the fixed component is what is called the non-

refundable fee). If the loan closes promptly, the total commitment fee payable is low—may indeed be little more than its fixed component. If the loan is delayed, the fee is higher; the longer the delay, the bigger the fee. If the loan falls through, the termination fee clicks in; if the loan closes, the much larger closing fee becomes payable instead. None of the fees, except of course the closing fee, is contingent on the loan's actually being made; none therefore is contingent on the parties' working out mutually satisfactory terms on questions left open by the initial loan agreement. On the contrary, the termination fee is conditional on the loan's *not* going through (though we shall raise a question about that later). The fees are compensation not for the loan but for the costs incurred by the bank in preparing the loan documents, in selling participations in the loan to other banks (a common way of spreading risks and overcoming regulatory lending limits), and in forgoing other lending opportunities as a consequence of having to hold the money for the loan in readiness during the period of negotiation. Banking regulations limit the volume of commitments that a bank may make, so committing to ATN might cause the bank to turn down another potentially profitable commitment during the period of negotiation.

But how can the various fees prescribed in the fee letter *not* be contingent on the loan's being made, asks ATN rhetorically, when by refusing to agree to terms suggested by ATN or by insisting on terms that it knows to be unacceptable to ATN the bank could scotch the loan and walk off with hundreds of thousands of dollars in fees for doing nothing, or at least very little? This point overlooks not only the effect of a concern with reputation in limiting opportunistic behavior by commercial enterprises which hope that the current contract is not their last, *United States v. Stump Home Specialties Mfg., Inc.,* 905 F.2d 1117, 1122 (7th Cir.1990); *Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429, 438 (7th Cir.1987); *id.* at 448 (dissenting opinion); *Kumpf v. Steinhaus,* 779 F.2d 1323, 1326 (7th Cir.1985), but also the contract doc-

trine of good-faith performance, *Market Street Associates Limited Partnership v. Frey,* 941 F.2d 588, 593–97 (7th Cir.1991), standardly applied to cases in which the contract requires that performance be to the satisfaction of the paying party. A party cannot withhold satisfaction in bad faith—that is, cannot take the position that he is not satisfied when in fact he is. *Morin Bldg. Products Co. v. Baystone Construction, Inc.,* 717 F.2d 413, 415 (7th Cir. 1983); *Thompson–Starrett Co. v. La Belle Iron Works,* 17 F.2d 536, 541 (2d Cir.1927) (L. Hand, J.). That takes care of the hypothetical case in which the bank refuses to accept a term offered by the borrower merely because the bank wants to slither out of its loan commitment and pocket the fees. That is not this case; here the shoe was on the other foot; it was the borrower that balked at a reasonable condition.

There is more to the doctrine. It would also forbid the bank to insist on an unreasonable condition, or a condition it would not have insisted on but for the siren song of the fee agreement. Granted, there is in general no duty to bargain in good faith over the terms of a contract (the loan agreement), 1 Farnsworth, *supra,* § 3.26 (though of course parties can impose such a duty, and often do, for example in *Chase v. Consolidated Foods Corp.,* 744 F.2d 566, 571 (7th Cir.1984), and *Channel Home Centers v. Grossman,* 795 F.2d 291, 298–99 (3d Cir.1986)). But that is because parties have maximum bargaining freedom before a contract has been made inaugurating a relationship between them. The duty of good faith is weak in the formation stage of a contract, if indeed it can be said to exist at all there. Once a contractual relation is formed, however—and it was formed here, as we have seen, by the commitment and fee letters, which were contracts—the duty of good-faith *performance* enters the picture and requires bargaining in good faith over terms left open by the original contract; for that bargaining is a component of the anticipated performance. The distinction and its reasons are elaborated in *Market Street Associates Limited Partnership v. Frey, supra,* at

594–95. See also *Maksym v. Loesch*, 937 F.2d 1237, 1242 (7th Cir.1991).

■ Were it not for the doctrine of good faith (or, what amounts to the same thing, an implied condition of good-faith bargaining over the terms of the loan), the commitment letter, by making the loan conditional on the working out of mutually satisfactory terms, would have placed ATN at the mercy of the bank and might have given the bank an incentive to exploit its leverage by refusing to come to terms so that it could pocket the fees set forth in the fee letter without doing anything to earn them. We say "might" rather than "would" not only because of reputational concerns that might impel the bank to display forbearance but also because the stiff closing fee would act as a deterrent to opportunistic behavior by the bank—the bank gives up that fee if the loan never closes. At all events, the bank did not violate its duty of good faith by insisting that the loan be conditional on approval by the Virgin Islands Public Service Commission of ATN's purchase of Vitelco. It had been understood from the outset that the bank wanted security from ATN and that the security would be the stock of Vitelco, which would be worth nothing if the Commission prevented ATN from acquiring Vitelco's stock. Of course the Commission might not be able to prevent this; it might not have jurisdiction. So ATN believed. It was wrong. That it was wrong bolsters the bank's contention that the condition was a reasonable one but in any event ATN has so stipulated, removing the issue from the case. With the doctrine of good faith in place to protect ATN from being taken advantage of by the bank, the question becomes why ATN should be permitted to waltz from bank to bank collecting commitment letters free of charge while planning to use only one of them—authorized conduct if as ATN argues the commitment letter created no enforceable promise because there were open terms.

■ ATN also tries to avoid the fee agreement by invoking the doctrine of impossibility. A valid governmental decree forbidding a party to perform a contract is a standard occasion for invoking the doctrine. *Restatement, supra,* § 264. But ATN is not the performing party in the fee agreement; it is the payor. The refusal of the Virgin Islands commission to allow the purchase of Vitelco did not prevent ATN from paying fees to the bank; it just prevented the loan from going through (at once anyway); the fees were (in part) to compensate the bank for setting money aside for a loan that might never close. The doctrine of impossibility, like the doctrine of good faith, is a gap filler; it must not be used to alter an agreed upon allocation of risk. Parties to contracts know better than a court does what allocation of risk is best for them.

Furthermore, a defense of impossibility must fail when the party invoking it has not made reasonable efforts to prevent occurrence of the event that has made performance impossible. *Commonwealth Edison Co. v. Allied–General Nuclear Services,* 731 F.Supp. 850, 860 (N.D.Ill.1990). We know from what happened later that the PSC would approve a suitably configured acquisition of Vitelco by ATN—which broke off negotiations with the bank that were intended to reconfigure the loan agreement so that it would be satisfactory to the Commission. ATN cannot make performance impossible and then cry impossibility.

■ No more persuasive is its argument that the termination fee is a penalty because it is not proportioned to the actual harm likely to be suffered by the bank if the loan aborted. That harm would be difficult to quantify. The bank would lose interest income on a $75 million loan but whether this would be a net loss would depend on its alternative uses for the money and whether the loan would actually have been repaid on time, with full interest, etc. Parties are more likely to make a reasonable estimate of the harm from a breach of contract than judges are—it is the parties' money that is on the line, after all—even though the parties are making it in advance whereas the judges would be assessing harm after it had occurred as a result of a breach. If the parties make a

mistake they have only themselves to blame; why should the courts get involved? Of course it is settled doctrine in Illinois (as in other states), and therefore binding on us, that a party can complain that a liquidated damages provision to which it freely and knowingly consented was actually a penalty and therefore void. *Hickox v. Bell,* 195 Ill.App.3d 976, 987, 142 Ill.Dec. 392, 399, 552 N.E.2d 1133, 1140 (1990); *Lake River Corp. v. Carborundum Co.,* 769 F.2d 1284, 1289–90 (7th Cir.1985). But the party making this paternalistic argument has the burden of proof, *Weiss v. United States Fidelity & Guaranty Co.,* 300 Ill. 11, 16, 132 N.E. 749, 751 (1921), and ATN has made no effort to show that it might be able to carry that burden.

All that we have said so far was clear enough to be decided without a trial. And we add that the bank's entitlement to prejudgment interest is made clear by *Residential Marketing Group, Inc. v. Granite Investment Group,* 933 F.2d 546, 549–50 (7th Cir.1991). But there is one point on which we part company with the learned district judge. That has to do with his decision to let the commitment fee continue to accrue after February 15. The bank points out correctly that the fee agreement has no explicit termination date. The February 15 date which ATN argues cut off its liability for the commitment fee appears only in the termination-fee clause, where it is the date on which the bank becomes entitled to the termination fee if the loan has not closed. Well, but that must be the termination date. Otherwise there would be the absurdity that if the loan closed on February 16, the bank would be entitled to a "termination" fee even though there had been no termination. February 15 was intended as the date by which, if the loan hadn't closed, the parties could walk away from the agreements without liability save what had accrued up till then, including the termination fee itself.

 This means that ATN is liable for a commitment fee accruing after that date only if the fee agreement was extended. Quite possibly it was. The parties did not believe that the refusal of the PSC to approve ATN's purchase of Vitelco would derail their deal. They thought it was a temporary roadblock and continued negotiating. Had they come to terms during this period the natural inference would be not that they were negotiating for a new contract but that they had by their conduct extended the old agreements, as in *Autotrol Corp. v. Continental Water Systems Corp.,* 918 F.2d 689, 691–92 (7th Cir.1990). The commitment fee would have continued to mount up and the termination fee would have been avoided because there would have been no termination.

ATN, however, submitted evidence (as yet unrefuted) that it asked the bank for a written extension of the commitment and fee agreements and was turned down. That is some indication that the agreements were not extended. Maybe—though it seems most unlikely—the bank would have tried to stick ATN with the termination fee even if the loan eventually had gone through, on the ground that the fee became due and owing on February 15 if the loan did not close by then (even if it closed later) unless the parties extended the agreements and thereby the termination date; and they had not done so. That is the outcome the bank's counsel defended at argument, though of course not on the ground that the fee agreement had not been extended but on the ground that it hadn't expired until the negotiations over the terms of the loan broke down. Or maybe the bank wanted to protect its freedom of action during the post-February 15 negotiating period, and really didn't extend the earlier agreements.

All this is murky enough to preclude, in our opinion, summary judgment regarding the commitment fee due beyond February 15, on the record in its present state—which is not to say that it might not be resolved by additional discovery, without a full trial. The rest of the judgment is affirmed.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.