**Filed 11/6/96**

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

475342 ALBERTA LTD., an Alberta corporation,

        Plaintiff - Appellant,
        Cross-Appellee,

    v.

DATAPHON CELLULAR PARTNERSHIP and JOHN F. KANE,

        Defendants - Appellees,
        Cross-Appellants.

Nos. 95-5213 and 96-5000

N.D. Oklahoma

(D.C. No. 95-C-174-BU)

---

475342 ALBERTA LTD., an Alberta corporation,

        Plaintiff - Appellant,
        Cross-Appellee,

    v.

CONSTITUTION CELLULAR and JOHN B. KANE,

        Defendants - Appellees,
        Cross-Appellants.

Nos. 95-5214 and 96-5001

N.D. Oklahoma

(D.C. No. 95-C-175-BU)

## ORDER AND JUDGMENT[*]

Before **ANDERSON**, **HENRY**, and **MURPHY**, Circuit Judges.

These are diversity contract actions which we have combined for convenience on appeal. The central question is whether the defendants in each case are liable for $100,000 in liquidated damages under the following provision contained in two identical contracts:

> The system[s] to be constructed using the proceeds of the loan we have committed to providing herein must utilize cellular system equipment and ancillary equipment and services supplied by NovAtel. Should you refer to this commitment in any filing or application presented to the FCC in connection with one of the proposed systems listed on Schedule A, and fail to purchase NovAtel equipment in connection with the construction of a system listed on Schedule A, there shall become immediately due and payable from Applicant to NovAtel a fee of U.S. $100,000 in liquidated damages.

The district court found no liability and granted the defendants' motions for summary judgment, from which the plaintiffs appeal. The court determined that liquidated damages under the clause quoted above were subject to two conditions precedent: (1) a

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

loan--which never eventuated in either case, and (2) the construction and operation of a cellular telephone system by the defendants--which did not occur in one case--for an amount not exceeding the loan commitment contained in the agreements--which did not occur in the other case. The court found in the alternative that the documents containing the liquidated damage clause were agreements to agree, hence unenforceable. Subsequently, the district court denied the defendants' claims for attorneys' fees under Okla. Stat. tit. 12, § 936 (1991). The defendants appeal from that judgment.

## I. BACKGROUND

### A.

The plaintiff in these actions, 475342 Alberta Ltd., is a successor in interest to the rights of NovAtel Communications, Ltd., under circumstances not disclosed in the record. Because NovAtel is a party to the agreements being construed, we refer primarily to it in this opinion.

The defendants in Appeal No. 95-5213 are Dataphon Cellular Partnership and John F. Kane (collectively "Dataphon"). The defendants in Appeal No. 95-5214 are Constitution Cellular and John B. Kane [1] (collectively "Constitution").[2] In 1988, the year

_____

[1]The record does not show whether John F. Kane and John B. Kane are the same person and, if so, the reason for a different middle initial.

[2]Dataphon's and Constitution's appeals relating to the denial of attorneys' fees are Appeals No. 96-5000 and No. 96-5001, respectively.

(continued...)

in which the letter agreements in question were signed, Dataphon and Constitution had

the same address--50 California Street, Suite 470A, San Francisco, California--and each

had a partner named John Kane.

Both Dataphon and Constitution were apparently formed for the purpose of

playing the FCC lottery for cellular telephone licenses. The context has been described as

follows:

> In order to streamline the licensing process and to provide cellular service
> to the public in a more timely manner, the Commission has since 1984
> selected the tentative licensee from among competing applicants through a
> lottery, as authorized by section 309(i) of the Communications Act, 47
> U.S.C. § 309(i) (1988), rather than through competitive hearings. Each
> facially complete application is qualified to be included in a lottery for a
> particular Service Area license . . . .
>
> When the lottery produces a tentative selectee, the Commission
> reviews only the selected application to determine whether it is "acceptable
> for filing," *i.e.*, whether it complies with the FCC procedural and
> substantive rules and regulations. . . . If it is determined that the application
> is acceptable, the Commission provides public notice as to the identity of
> the tentative licensee. Competing applicants are then entitled to challenge
> the application of the tentative licensee by filing petitions to deny the
> application.

Florida Cellular Mobil Communications Corp. v. FCC, 28 F.3d 191, 193 (D.C. Cir. 1994)
(citations omitted) (describing the FCC's general procedures for selecting licensees for
Services Areas other than the nation's thirty largest), cert. denied, 115 S. Ct. 1357 (1995).

The relevant lotteries pursued by Dataphon and Constitution were for 422 Rural

Service Areas (RSAs) scattered across the United States. Both apparently filed

---

[2](...continued)

applications for each RSA. These 800-plus applications yielded a lottery win of at least one license to each entity: Dataphon received the South Carolina - 4 RSA on October 4, 1989, and Constitution received the California - 3 RSA.[3] Dataphon held its license for more than two years without constructing or operating a cellular telephone system, then sold it--apparently for millions--to an unrelated entity, United States Cellular Corporation ("U.S. Cellular"). Constitution assigned its license to California Alpine - 3 ("Alpine"), a limited partnership in which all the original Constitution partners owned a pro rata interest. Alpine constructed and operated the system for the California-3 RSA.

In order for their applications to be considered by the FCC, Dataphon and Constitution were required to comply with various rules and regulations, including those pertaining to financial fitness. See 47 C.F.R. § 22.917(c) (1988). Section 22.917(c) provides, in part, as follows:

> A non-wireline applicant for a new station shall demonstrate, at the time it files its application, that it has either a firm financial commitment or available financial resources necessary to construct and operate for one year its proposed cellular system. The firm financial commitment may be contingent on the applicant obtaining a construction permit . . . (emphasis added).

Dataphon and Constitution employed a dual approach to satisfy this provision: reliance on their own balance sheets and written financial commitments from NovAtel.

---

[3]The record does not reveal the precise date upon which Constitution received its license.

The NovAtel commitments, in the form of letter agreements, are the basis of this controversy.

In order to facilitate its business of manufacturing and selling cellular telephone system equipment, NovAtel entered into agreements with license applicants in which it committed to loan the applicant an amount sufficient to cover the estimated cost of constructing and operating a cellular system for one year. The applicant, such as Dataphon and Constitution, would then submit the loan commitment to the FCC as part of the license application, to satisfy the "firm financial commitment" proviso of 47 C.F.R. § 22.917(c).

Under the agreement, NovAtel would provide the equipment and the "loan" would be structured as a line of credit against the expenses of purchasing the equipment and constructing and operating the system for one year. Essentially, these were agreements for a potential sale of equipment on credit up to a specified amount, plus advances for a year's operating expenses, all cast in the form and language necessary to comply with FCC regulations regarding firm financial commitments.

NovAtel's agreements with Dataphon and Constitution are identical and appear to be form contracts cast as letters, with a space in which to insert the applicant's name, and signature blocks for both the "applicant" and NovAtel. Each agreement is dated July 8, 1988, and shows Mr. Kane's signature, on behalf of each applicant, on July 11, 1988.

The agreements consist of twenty single-spaced paragraphs (exclusive of lettered subparagraphs), twelve of which are numbered terms and conditions.

For the stated consideration of $1.00, NovAtel commits in the agreements to lend the "applicant" up to a million dollars for the construction and operation of a cellular system in one or more of the RSAs "listed in Schedule A." That schedule is identical for both the Dataphon and Constitution agreements, and, as indicated above, lists approximately 420 RSAs.

The twelve numbered terms and conditions, which include paragraph 5, the liquidated damages provision quoted above, read as follows:

> Our performance under this commitment is subject to the following terms and preconditions:
>
> 1)      You must receive the U.S. Federal Communications Commission's ("FCC's") authorization to construct one or more of the cellular systems identified on the attached Schedule A, and that award must not be subject to further review or reversal under the FCC's Rules;
>
> 2)      The loan committed to herein will be structured as a line of credit, which may be drawn upon as needed and as provided for in our Loan Documents (defined below) to pay the verified expenses incurred in constructing and operating one or more of the cellular systems authorized by the FCC and listed in Schedule A;
>
> 3)      This loan commitment is effective and enforceable for one year after the date first noted above, but may be renewed at its expiration by the payment of a further Commitment Fee and upon NovAtel's approval of Applicant's financial condition at that time;
>
> 4)      As presently envisioned, the loan will:

(a) incur interest at a floating rate two percentage points greater than that specified as the "Prime" rate for major banks by the Wall Street Journal, interest shall accrue from drawdown;

(b) be repayable over 7 years monthly in arrears interest only in the first 2 years, monthly payments of principal (equal payments) and interest thereafter; and

(c) be secured by first, perfected and primary security interests in all of the assets of the system[s] constructed using the funds loaned pursuant to this commitment, and, except where Applicant is an individual, all of the equity in Applicant;

5) The system[s] to be constructed using the proceeds of the loan we have committed to providing herein must utilize cellular system equipment and ancillary equipment and services supplied by NovAtel. Should you refer to this commitment in any filing or application presented to the FCC in connection with one of the proposed systems listed on Schedule A, and fail to purchase NovAtel equipment in connection with the construction of a system listed on Schedule A, there shall become immediately due and payable from Applicant to NovAtel a fee of U.S. $100,000 in liquidated damages;

6) NovAtel, Applicant and Applicant's principals must enter into all necessary agreements reasonably required by NovAtel and typically required by NovAtel in connection with similar transactions, including but not limited to, where applicable, System Sale, Loan and Security, and Pledge and Escrow Agreements, Notes, Leasehold and/or Freehold Mortgages and Uniform Commercial Code Filing Statements (the "Loan Documents"). All such Loan Documents shall conform in all respects with relevant FCC rules and policies, especially 47 C.F.R. Section 22.917(d) (1987);

7) Applicant will pay all costs incurred by NovAtel in making the loan committed to herein, including, but not limited to, all attorneys' fees, filing costs, etc., incurred in connection with drafting the Loan Documents and consummating the agreements set forth in the Loan Documents;

8)     All of the representations you have made to us, or which have been made to us on your behalf by your agents, including all financial information presented to us for our consideration, must be true, correct and accurate in all material respects at the present time and at the time the Loan Documents are executed;

9)     There shall not be any material adverse change in Applicant's financial condition or business plans, including the relevant financial commitments of Applicant's partners reflected in the financial information you have provided to us, and no change in Applicant's ownership, prior to NovAtel's making the loan committed to herein, and there shall be no change in the facts underlying your business plans, or in the assumptions supporting your business plans such that these business plans or the underlying assumptions would be materially and adversely changed;

10)    Neither this commitment nor any of the benefits hereunder may be assigned by Applicant to any party or entity without NovAtel's prior written authorization and any such assignment without NovAtel's authorization shall not be binding in any manner upon NovAtel;

11)    You agree to indemnify and hold NovAtel harmless, and to reimburse NovAtel fully, for any liability, forfeiture, penalty, expense, cost or similar obligation incurred by NovAtel arising out of any inquiry, dispute, litigation or claim in connection with, or in any way related to, directly or indirectly, whether instituted by you or another, this Commitment or the terms or obligations of NovAtel hereunder, including reasonable attorneys' fees and legal costs related thereto;

12)    This commitment letter shall be executed on behalf of Applicant and an executed copy delivered to NovAtel.

Both Dataphon and Constitution attached their respective financial commitment agreements with NovAtel to their multiple applications to the FCC for cellular licenses, referring to them as follows:

> The Applicant has significant financial resources at the Applicant's disposal to both construct and operate the cellular radio system, as demonstrated by the independently audited balance sheet and Applicant certification attached as Exhibit 2.1 and Exhibit 2.2 hereto.  <u>See Exhibit 2.3 [NovAtel's commitment] regarding the external financing to be used, if any</u>.

Appellant's App. (No. 95-5213) at 18; Appellee's App. (No. 95-5214) at 58 (emphasis added).

According to the language just quoted, and its referenced Exhibits 2.1 and 2.2 (financial statements and certifications of Dataphon and Constitution, respectively), Dataphon and Constitution relied primarily on their own balance sheets to satisfy the financial qualification requirement of 47 C.F.R. § 22.917(c).   But in other parts of their applications, both entities referred in somewhat ambiguous terms to the NovAtel commitments as satisfying the "firm financial commitment" requirement of the regulations:

> Pursuant to these requirements the Applicant has secured, in writing, binding firm quotations from a  major equipment manufacturer for equipment acquisition and installation costs, and associated construction items.
>
> The Applicant is proposing to finance the system's construction and first year's operating costs by several methods, including internal funding.  Full compliance with Section 22.917(c) of the Rules is evidenced in Exhibit 2 of this Application including all documents required by Section 22.917(c)(6). (See Exhibits 2.1, 2.2 and 2.3.)
>
> The preliminary projected costs for system construction and first year operation, are presented in Table 5-1.
>
> The Applicant's ability to finance the system's construction and first-year operating costs is demonstrated in Exhibit 2 to this Application.  Exhibits

2.1 and 2.2 demonstrate the Applicant's ability to finance these costs internally.  External financing to be used, if any, is shown in Exhibit 2.3.

Appellant's App. (No. 95-5213) at 28; Appellant's App. (No. 95-5214) at 31.

The agreements, which by their terms expired in one year, were subsequently renewed through separate, identical agreements in the form of letters from NovAtel to Constitution and Dataphon, dated July 7, 1989.  These renewals referenced as their subject matter:  "Renewal of Financial Commitment--Pending RSA Applications."

On October 5, 1989, counsel for Dataphon requested a second financial commitment from NovAtel to cover Dataphon's "second lottery win in the South Carolina 4 - Chesterfield RSA held on October 4, 1989."  Appellant's App. (No. 95-5213) at 94. The letter stated, among other things, that Dataphon needed to file a financial commitment with the FCC on November 6, 1989.  NovAtel then issued its substitute commitment letter, dated October 12, 1989, along with a further letter-agreement adding material financial benchmark provisions.  The substitute commitment, including the accompanying agreement, directly addressed a commitment for the South Carolina - 4 Chesterfield RSA, while leaving the original commitment in force for other RSAs. Specifically, the substitute commitment provided that:

> [T]his letter sets forth a commitment in addition to the commitment set forth in the June 23, 1988 letter insofar as that letter was and is being relied upon by you and was incorporated into your applications for FCC permits to construct cellular radiotelephone systems in other rural service areas, specifically including but not limited to the Colorado - 7 RSA.

Id. at 97.[4]

On November 15, 1989, counsel for Dataphon again wrote NovAtel, this time pointing out that a material provision had been omitted from the October 12 commitment agreement, and requesting a replacement commitment letter containing the provision. The replacement, dated December 7, 1989, was provided by NovAtel on that date.

**B.**

As indicated above, Dataphon did refer to the financial commitment by NovAtel in filings with the FCC. It did obtain a permit from the FCC. And, it did not purchase NovAtel equipment or obtain any loan from NovAtel. Rather, it sold and assigned the license for the South Carolina - 4 Chesterfield RSA to U.S. Cellular.

Also, as indicated above, Constitution did refer to the financial commitment by NovAtel in filings with the FCC. It did obtain a license from the FCC. And, it did not purchase NovAtel equipment or obtain any loan from NovAtel.

Alberta filed these actions for liquidated damages in 1995, several years after the events in question. Its argument is straightforward: paragraph 5 of the agreements specifies $100,000 in liquidated damages if Dataphon and Constitution, respectively,

---

[4]The reference to June 23, 1988, is apparently in error, with the reference properly being to the original commitment agreement dated July 8, 1988, which Alberta attached to its complaint. The complaint filed by Alberta against Dataphon also is less than clear regarding the differently dated agreements. The complaint refers in paragraph 11 to the October 12, 1989, agreement, but attaches only the July 8, 1988, agreement.

refer to the financial commitment in any filing or application with the FCC and subsequently fail to purchase NovAtel equipment. Alternatively, it argues unjust enrichment, and that the district court erred in failing to address this alternative theory.

Dataphon and Constitution advance the same arguments on appeal that they made in the district court. They contend that sub-paragraph 5 created two conditions precedent to any duty to actually purchase NovAtel equipment. First, they had to actually construct a cellular system in the RSA. Second, they had to actually draw on the NovAtel funds for the construction. Since it is undisputed that Dataphon did neither, Dataphon argues it has no liability for damages. Constitution admits that its assignee, Alpine, did construct a system, but argues that NovAtel did not loan it any money and, in any event, the system it built cost more than $1,000,000, and its agreement with NovAtel applied only to construction and operation of a system for $1,000,000 or less.

In the alternative, Dataphon and Constitution argue that the liquidated damage provision in paragraph 5 is unenforceable because the entire Agreement is merely an "agreement to agree." In support, they point to the prefatory language of numbered paragraph 4 of the Agreement, which refers to the financing arrangement "[a]s presently envisioned." And, numbered paragraph 6 predicates the lending of money on the parties entering into "all necessary agreements reasonably required by NovAtel . . . ." All this, Dataphon and Constitution urge, demonstrates that the agreement was fatally incomplete.

Finally, Dataphon and Constitution argue that any duties and liabilities they may have had expired along with the Agreements themselves: no later than December 1990, in the case of Dataphon, and July 1990, in the case of Constitution. Dataphon notes that the transfer of its FCC permit to U.S. Cellular occurred over a year after the Agreement's expiration.

In response, Alberta contends that sub-paragraph 5 does not predicate Dataphon's liability on the actual lending of money or the actual construction of a cellular system in the RSA. Yet, even if such conditions precedent existed, Alberta argues, Dataphon could not rely on them because Dataphon prevented their occurrence by selling the permit to U.S. Cellular. Furthermore, Alberta asserts that Dataphon and Constitution should be estopped from claiming that the Agreements are nonbinding because they benefited from the Agreements by relying on them in their FCC applications. Alberta also contends that the district court erred in refusing discovery into the cost, and related matters, of the system constructed by Alpine.

As to all these arguments, we review the grant of summary judgment de novo, Universal Money Ctrs., Inc. v. American Tel. & Tel. Co., 22 F.3d 1527, 1529 (10th Cir.), cert. denied, 115 S. Ct. 655 (1994), and we may affirm upon any ground supported by the record. Sat-Tech Int'l Corp. v. Delutes (In re Sat-Tech Int'l Corp.), 47 F.3d 1054, 1057 (10th Cir. 1995).

## II.  DISCUSSION

The parties insist that the agreements are unambiguous.  On the points argued by the parties, we conclude that is so with respect with Dataphon, but not as to Constitution.  Because the Dataphon Agreement contains no relevant ambiguities, we ascertain the intentions of Dataphon and NovAtel from the agreement as a whole.  See Public Serv. Co. of Oklahoma v. Burlington N. R.R. Co., 53 F.3d 1090, 1097 (10th Cir. 1995); Dillard & Sons Constr., Inc. v. Burnap & Sims Comtec, Inc., 51 F.3d 910, 914 (10th Cir. 1995); Heskett v. Heskett, 896 P.2d 1200, 1202 (Okla. Ct. App. 1995).

At the outset we reject three arguments advanced by both Dataphon and Constitution.  First, these are not agreements to agree.  It is untenable for Dataphon and Constitution to so argue when they represented to the FCC that the agreements were binding.  All the material terms are contained in the agreements, and it is significant in this regard that Dataphon's counsel insisted on a reissued commitment because a material term had been omitted.  Collateral documents necessary to effectuate the terms of the agreements had ascertainable standards by reference to common commercial practice, FCC rules and policies, and other NovAtel transactions.  It is a settled principle that the law does not favor invalidation of agreements on the grounds of uncertainty, and a contract is not void for uncertainty because it fails to set out all details with respect to the subject matter if it can be ascertained with a reasonable degree of certainty what the parties intended.  Brown v. Bivings, 277 P.2d 671, 673 (Okla. 1954).  That is the case

-15-

here.  See First Nat'l Bank of Chicago v. Atlantic Tele-Network Co., 946 F.2d 516 (7th Cir. 1991); Teachers Ins. and Annuity Ass'n of Am.  v. Tribune Co., 670 F. Supp. 491, 498 (S.D.N.Y. 1987) (finding in a loan commitment context that the obligation of good-faith performance "bar[s] a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement").

Second, the fact that Dataphon and Constitution filed financial statements with the FCC showing an ability to finance the systems in question from internal sources does not demonstrate that NovAtel's financial commitments were essentially meaningless.  The applications show on their face that Dataphon and Constitution considered NovAtel's commitments to be material and necessary.  And, subsequent renewal requests (some with considerable urgency) confirm that fact.  We have no difficulty concluding that NovAtel's commitments were valuable to Dataphon and Constitution, and that they relied on them in their filings and applications with the FCC.

Third, Dataphon and Constitution were not excused from the damage provision of paragraph 5 after expiration of the term of the contracts.  By availing themselves of the benefit of NovAtel's financial commitment in filings with the FCC, Dataphon and Constitution obligated themselves under paragraph 5 for the term of the agreements and at least a reasonable time thereafter.  Whatever period that may be, we conclude that it did not expire here.

From this point the two cases diverge, so we address them separately.

-16-

## A. Dataphon

Once again, paragraph 5--the damages provision of the agreements--provides as follows:

> The system[s] to be constructed using the proceeds of the loan we have committed to providing herein must utilize cellular system equipment and ancillary equipment and services supplied by NovAtel. Should you refer to this commitment in any filing or application presented to the FCC in connection with one of the proposed systems listed on Schedule A, and fail to purchase NovAtel equipment in connection with the construction of a system listed on Schedule A, there shall become immediately due and payable from Applicant to NovAtel a fee of U.S. $100,000 in liquidated damages[.]

Dataphon did not purchase any equipment from NovAtel because it sold its rights to U.S. Cellular. In its brief, Alberta relies heavily on the "fail to purchase" clause in isolation, arguing that since Dataphon "failed to purchase," it owes NovAtel $100,000. In the process, Alberta essentially converts the "liquidated damages" to a fee for NovAtel's financial commitment. That interpretation of the second sentence of paragraph 5 is unsupportable for three reasons.

First, the contract does not have any force-majeure clause, does not address the possibility of a sale by Dataphon of all of its rights, and in other respects does not address the multitude of possibilities that might result in a "failure to purchase" NovAtel equipment. It would be an extraordinarily expansive reading of the "fail to purchase"

-17-

clause to conclude that the parties intended Dataphon to pay $100,000 to NovAtel under any conceivable circumstance which could result in nonpurchase.[5]

Second, Alberta's theory that the $100,000 damage figure converts to a fee for the financial commitment is not borne out by the text of paragraph 5. If the parties intended something of that nature, they would have expressed it in fuller terms--possibly in a separate paragraph reserved for that purpose--especially in view of the fact that the opening paragraph of the agreement recites $1.00 as sufficient consideration for the financial commitment.

Third, Alberta's repeated emphasis on the "fail to purchase" clause completely neglects the clause's relationship to the rest of the sentence:

> Should you refer to this commitment in any filing or application presented to the FCC in connection with one of the proposed systems listed on Schedule A, and fail to purchase NovAtel equipment in connection with the construction of a system listed on Schedule A, there shall become

---

[5]In the context of the FCC applications here, it is understandable why NovAtel may not have had assignment of Dataphon's rights in mind in connection with these agreements. FCC regulations required applicants to warrant that they actually intended to construct and operate the cellular station. See, e.g., 47 C.F.R. § 22. 923(b)(7) (1988). In their applications, both Dataphon and Constitution stated:

> The Applicant warrants that the Applicant's motivation for filing this application is the Applicant's intention to provide cellular service to the public. The Applicant is specifically not interested in obtaining this license for sale or other disposition at any time, and is applying to construct and operate the system as a business venture.

Appellant's App. (No. 95-5213) at 18; Appellant's App. (No. 95-5214) at 20.

immediately due and payable from Applicant to NovAtel a fee of U.S. $100,000 in liquidated damages[.] (emphasis added).

The sentence refers directly to Dataphon ("should you . . ."), and the clause, on its face, does not address a situation where there is no construction. Taken in conjunction with the first sentence in paragraph 5, the second sentence essentially stands for the unremarkable proposition that if Dataphon takes advantage of the financial commitment in its filings with the FCC, it may not use a competitor's equipment when it constructs a system, unless it pays damages to NovAtel.

This agreement simply reflects NovAtel's marketing strategy of extending the inducement of financial commitments to secure the subsequent sale of its products when a successful applicant actually constructs a cellular telephone system, and imposing a penalty if a competitor's equipment is used. Thus, we do not read the second sentence in paragraph 5 as expansively as Alberta. To the extent there is any doubt on the point, we resolve it against the drafter, NovAtel, especially since we are dealing with a damages provision.

On this view of the contract, Alberta's unjust enrichment argument fails as well, since Dataphon was doing no more than the agreement permitted.


**B. Constitution**

Constitution presents a different situation because it did (through Alpine) construct a system and failed to purchase NovAtel equipment. Yet, Constitution argues among

-19-

other things, that it was excused from the obligation to purchase NovAtel equipment because its agreement with NovAtel was limited to a $1,000,000 commitment and the system built by Constitution cost substantially more. We find the contract ambiguous on this point.

As previously noted, the first sentence of paragraph 5 stands for the unremarkable proposition that any money advanced by NovAtel must be used to purchase NovAtel equipment. It does not, as Constitution contends, require an actual extension of the loan as a pre-condition to the damages provision in the next sentence. But the two sentences of paragraph 5 are plainly related to each other, as well as to the terms of the rest of the agreement. All these terms relate to a specific loan maximum, and to the construction of a specified system costing less than that maximum. Whether the parties intended the second sentence of paragraph 5 to have a more expansive meaning than construction of a system costing less than $1,000,000 is not clear.

Furthermore, there are troubling ancillary questions. Constitution represented both in the initial agreement and in its request for a renewal one year later that the system it was going to construct would cost less than $1,000,000, leading NovAtel to proceed on that basis. It is wholly unexplained on this record how the cost suddenly increased to as much as $3,000,000 without (a) implicating whether there was a misleading representation on the part of Constitution to begin with, or (b) questions about the cost and nature of the system actually built compared to the one originally envisioned by

NovAtel and Constitution. And, finally, depending upon the evidence, it is conceivable that the doctrine of unjust enrichment may apply as asserted by Alberta.

In any event, we cannot decide within the four corners of the agreement or on the face of this record that there is no genuine issue as to any material fact and that one party should prevail as a matter of law. Accordingly, this case must be developed further in the district court. Beyond views expressed herein, we express no opinion on the availability or merit of any defense or issue which may be raised on remand.

### III. ATTORNEYS' FEES

With respect to Dataphon, we affirm the district court's denial of attorneys' fees. We have recently explained that the Oklahoma courts strictly construe the fee-shifting provisions of Okla. Stat. tit. 12, § 936 (1991). Octagon Resources, Inc. v. Bonnett Resources Corp. (In re Meridian Reserve, Inc.), 87 F.3d 406, 411-12 (10th Cir. 1996). Here, the district court determined that the agreement was a financial commitment, not a contract for the purchase or sale of goods. While the agreement created the possibility of a future contract for the sale of goods, such a contract never actually arose. Dataphon itself has never contended otherwise. We find no error in the district court's application of the statute.

Consistent with our disposition of the case involving Constitution, we vacate the district court's judgment denying attorneys' fees and remand that question as well.

-21-

## IV. CONCLUSION

The summary judgment in No. 95-5213 is AFFIRMED. The judgment denying attorney's fees in No. 96-5000 is also AFFIRMED.

The judgment in No. 95-5214 is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion. The judgment in No. 96-5001 is VACATED.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge